In re CHECKMATE STEREO AND ELECTRONICS, LTD., Debtor.

John S. PEREIRA, Trustee in Bankruptcy, Plaintiff,

v.

CHECKMATE COMMUNICATIONS CO., INC. and/or Checkmate Communications, Ltd. and/or Checkmate Stereo & Co., Inc. and/or Checkmate Automotive and Gerald Wren, Jr. and Gerald Wren, Sr., Defendants.

In re CHECKMATE MARKETING CO., INC., Debtor.

John S. PEREIRA, Trustee in Bankruptcy, Plaintiff,

v.

CHECKMATE COMMUNICATIONS CO., INC. and/or Checkmate Communications, Ltd. and/or Checkmate Stereo & Co., Inc. and/or Checkmate Automotive and Gerald Wren, Jr. and Gerald Wren, Sr., Defendants.

Bankruptcy Nos. 180–02124–21, 180–02125–21.
Adv. Nos. 180–0366, 180–0367.

United States Bankruptcy Court, E. D. New York.

Feb. 5, 1981.

Robert P. Herzog, New York City, for trustee.

Ballon, Stoll & Itzler, New York City, for defendants.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

These adversary proceedings, which were consolidated for trial, are brought by the trustee in bankruptcy of two related corporations: Checkmate Stereo and Electronics, Ltd. ("Stereo"), and Checkmate Marketing Co., Inc. ("Marketing"). The complaint invokes §§ 541, 544, and 548 of Title 11 of the United States Code.[1] The relief sought includes the nullification of various transfers of property to the defendants, a judgment against the defendants for conversion, and the award to the plaintiff of punitive damages, costs, and attorneys' fees.

## THE PARTIES

Defendants are Gerald Roy Wren ("Wren"), identified in the complaint as "Gerald Wren, Jr.," and his father, Gerald Vincent Wren ("Wren, Sr."), identified in the complaint as "Gerald Wren, Sr.," together with various other entities owned and controlled by the two men. Wren, Sr. is claimed to be the sole stockholder of the defendant Checkmate Communications, Ltd. ("Communications, Ltd.") and of the defendant Checkmate Stereo & Co., Inc. ("Stereo & Co., Inc."), of both of which

---

1. The Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2549 (Bankruptcy Code), was enacted on November 6, 1978 and is applicable to all bankruptcy cases commenced subsequent to September 30, 1979. All section references not otherwise identified are to the new Bankruptcy Code, codified as Title 11 of the United States Code. References to the former law are identified by the phrase "old Bankruptcy Act."

Wren is the president. The defendant Checkmate Automotive is a corporation of which Wren owns 50 percent of the stock. There is no such legal entity as Checkmate Communications Co., Inc. ("Communications Co."). That is either the name of a fictitious company, or an erroneous rendering of the corporate name of Communications, Ltd. Wren was the organizer, the only stockholder, and the sole executive of the two debtor corporations, Stereo and Marketing, now represented by the trustee.

## THE PLEADINGS

The complaint brought by Stereo sets forth seven causes of action. The first four each allege a fraudulent conveyance to the defendants of assets belonging to the debtors, including a leasehold, inventory, equipment, tools, leasehold improvements, machinery, and goodwill, all of which are asserted to have a value in excess of $200,000. The first cause of action alleges an actual intent to hinder, impede, delay, and defraud creditors; the second, third, and fourth causes of action allege constructive fraud. The defendants, in accepting the transfers, are alleged to have acted with fraudulent intent, and to have conspired to defraud the creditors of the debtors. The Stereo complaint also alleges a cause of action against Wren alone, charging breach of duty by him and a usurpation of corporate opportunity, in his acceptance on April 24, 1980 of an executive employment agreement from a competitor of the debtors' principal supplier. The last cause of action alleges conversion by the defendants of the name and trademark "Checkmate." As relief, the complaint seeks, *inter alia*, nullification of the various transfers to the defendants, a judgment for conversion of the defendants' property, compensatory damages for breach of Wren's fiduciary duties and conversion of the Checkmate trademark, and punitive damages and attorneys' fees.

The complaint filed on behalf of Marketing parallels that filed by Stereo, except that no usurpation by Wren of corporate opportunity is alleged.

The defendants have entered, in effect, a general denial. As an affirmative defense, they plead failure to state a cause of action and failure to comply with FRCP 9. No rulings were ever sought on these defenses.[2]

Endorsed on the defendants' answers was a demand for a trial by jury of all issues. Neither the answer, nor the demand, were filed with the Court, however, until subsequent to the expiration of the time within which a jury demand can be filed pursuant to Interim Bankruptcy Rule 9001(c), adopted by the Bankruptcy Court of the Eastern District of New York. As a result, the jury demand was struck on the motion of the trustee. The Court explained its decision in an Opinion rendered on November 25, 1980.[3]

## THE PROCEEDINGS HERETOFORE HAD HEREIN

As is admitted in the pleadings, an involuntary petition in bankruptcy was filed against each of the debtors on April 25, 1980. These petitions resulted in an order for relief on May 15, 1980, entered by consent. On June 5, 1980, the trustee applied for an attachment against certain property then in the possession of various of the defendants. The defendants were directed to show cause why "an order of attachment should not issue pursuant to FRCP Rule 64 made applicable herein by Bankruptcy Rule 764 and New York Civil Practice Law and Rule 6201(3)" against the leases and leasehold interests under which the defendants were occupying premises formerly used by the debtors, and against the fixtures, tools, office furniture, display equipment and inventory transferred by the debtors to the defendants. Sought to be attached also were the bank accounts, accounts receivable, and the commissions payable to Wren under an employment contract.

---

2. An allegation of a transfer with intent to defraud has been held sufficient to satisfy FRCP 9(b). *Ryan v. Jones*, 92 F.Supp. 308, 309 (E.D.Pa.1950).

3. *Rosen v. Dick*, 639 F.2d 82 (2d Cir. 1980), which considers, but does not decide, the effect of failure to file a jury demand, was not decided until after the trial herein.

Evidence was taken on June 11, 12, and 13, 1980 with respect to the relief requested. The trustee called as witnesses the defendant, Wren; a bookkeeper, Mary Smith, employed by various of the defendants; and Melvin Schwam, an employee of the debtors' major creditor, Audiovox Corp. ("Audiovox"). The defendants elected to call no witnesses, but did introduce into the record considerable documentary evidence.

The Court denied the requested attachment on the ground that on the facts presented, this relief was not available as an interim remedy under the statutes relied on by the trustee. However, the Court held that in view of "the substantial evidence already presented that a fraud has been practiced on the debtors' creditors," it believed that the trustee was "entitled to be protected from any further manipulation" of certain assets "to the detriment of the creditors of the debtors." Accordingly, at the conclusion of the hearing, the Court ordered the defendants to refrain from selling, encumbering, or in any manner disposing of the leases, leasehold interests, furniture, tools, and equipment which had formerly belonged to Stereo and to Marketing. It stated its reasons in an Opinion issued July 9, 1980.

## THE TRIAL

The trial of the two complaints commenced on December 2, 1980 and concluded on December 16, 1980. The trial took nine days. The trustee called five witnesses; the defendants, five. Wren was the principal witness for both sides.

The Court permitted the trustee to introduce as part of its case all the testimony and related exhibits of Wren and Schwam at the hearing on preliminary relief, after Schwam was made available at the trial for cross-examination on his testimony. Wren, Sr.'s testimony also came in by way of deposition, since he did not appear at the trial.

At the conclusion of the plaintiff's case on motion of the defendants, the Court dismissed the fifth cause of action in the Stereo complaint against Wren, alleging usurpation of a corporate opportunity, and the causes of action in both complaints claiming conversion of the trademark "Checkmate." In dismissing these causes, the Court stated that such dismissal "does not mean that the evidence or that the allegations contained in those causes of action are not to be deemed material with respect to the other causes of action."

## THE RELEVANT STATUTES

Prior to the adoption of the new Bankruptcy Code, a proceeding to recover a fraudulent conveyance would have required a plenary action either in the state or Federal courts, absent consent by the defendants to a summary proceeding in the bankruptcy court. See Section 67(e) of the old Bankruptcy Act. 28 U.S.C. §§ 1471(b) and (c) now vest jurisdiction in the bankruptcy court of all causes related to cases under Title 11.

A trustee in bankruptcy may seek to void fraudulent transfers under either, or both, 11 U.S.C. § 544 and 11 U.S.C. § 548. Transfers made subsequent to the filing of the petition are voidable under 11 U.S.C. § 549. The liability of the transferee of a voided transfer is covered by 11 U.S.C. § 550.

■ Section 548 is the successor to § 67(d) of the Bankruptcy Act, which, in turn, was derived largely from the Uniform Fraudulent Conveyance Act.[4] Only trans-

4. Section 548(a) provides:

"*§ 548. Fraudulent transfers and obligations.*

"(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

"(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

"(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

fers made within one year of the date of the filing of the petition may be challenged under § 548. Subsection (a) of § 548 consists of an introduction followed by four substantive paragraphs which replace the substance, respectively, of §§ 4, 5, 6, and 7 of the Uniform Fraudulent Conveyance Act. 4 *Collier on Bankruptcy* ¶ 548.02[1], p. 548–22 (15th ed. 1979). Section 548(a)(1) makes voidable any transfer accomplished with an actual fraudulent intent; the other substantive provisions are concerned with transfers for less than reasonably equivalent value under conditions from which fraud will be predicated in law, despite lack of actual intent to defraud. Unlike the Bankruptcy Act which the Code replaces, the presence or absence of reasonably equivalent value appears to be an objective test, not affected by the subjective good, or bad, faith of the transferee. *Compare* § 544(d)(2) with § 67(d)(1)(e) of the old Bankruptcy Act.

■  Section 544 of the Code imports state law into the Code. It makes voidable at the suit of the trustee any transfer that a judgment creditor or a' *bona fide* purchaser could challenge. It gives the trustee in bankruptcy " 'every right and power which is conferred by the law of the state upon its most favored creditor who has acquired a lien by legal or equitable proceedings.' " 4 *Collier on Bankruptcy* ¶ 544.02, p. 544–5, *quoting In re Waynesboro Motor Co.*, 60 F.2d 668, 669 (S.D.Miss.1932) (Holmes, J.).[5]

In 1925, New York adopted the Uniform Fraudulent Conveyance Act, which is now to be found in §§ 270–281 of the Debtor and Creditor Law of New York. While both New York's Debtor and Creditor Law, and 11 U.S.C. § 548, are derived from the Uni-

form Fraudulent Conveyance Act, there are significant differences between the two. As already noted, under § 548, absent actual fraudulent intent, the trustee must show that the transferor received less than a "reasonably equivalent value," an objective test. The parallel sections in New York's Debtor and Creditor Law employ the term "fair consideration," which, in turn, is defined in § 272 as incorporating the concept of "good faith." Fair consideration is only given when "as a fair equivalent therefor, and in *good faith* property is conveyed or an antecedent debt is satisfied or secured." (Emphasis supplied.)

New York's Debtor and Creditor Law, like 11 U.S.C. § 548(a)(1) makes fraudulent every transfer made with actual intent to defraud. But it goes further and authorizes the recovery of reasonable attorneys' fees where a conveyance is found to have been "made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud creditors." A trustee in bankruptcy is specifically named in the New York statute as entitled to recover such attorneys' fees.

### THE FACTS

■  In developing the relevant facts, the plaintiff, the trustee in bankruptcy of Marketing and Stereo, has been seriously hampered by two circumstances. First, the details of the transactions among the various Checkmate companies—the two debtors and the corporate defendants—are known only to Wren, and he has not been forthcoming. Second, critical records have never been turned over to the trustee, including all of Marketing's records and key books of

---

"(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

"(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

"(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."

**5.** Section 544(a) provides that "[t]he trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—" a creditor holding a judgment lien, or a creditor holding a return of execution unsatisfied or a *bona fide* purchaser.

account of Stereo. Wren claims that they were stolen just one month before the involuntary proceedings against the debtors were filed.

But while details are missing and will never be known, the critical facts are clear and undisputable.

There is no question but that on September 30, 1979, both Stereo and Marketing were insolvent. Their liabilities exceeded their assets.[6] It is also undisputed that on that date, each possessed substantial assets and was carrying on an active business. Outwardly, nothing changed between September 30, 1979 and May 15, 1980. Yet, when the trustee in bankruptcy went to the premises of each to take over its assets for the creditors, each turned out to be an empty shell. Neither was any longer a functioning enterprise; Marketing had no assets, other than $500 in cash, and Stereo's assets consisted of a hodgepodge of mostly used inventory and some pledged accounts receivable. During the eight months in which the assets of both companies evaporated, their affairs were entirely in the control of Wren, the sole stockholder, president, and only executive officer of both debtors. Further, the assets which had formerly belonged to the debtors all ended up as the property of other corporations of which Wren was also the president, and of which his father was allegedly the owner. In each case, the business formerly conducted by each debtor was being carried on in the same premises, with the same fixtures and with the same personnel, by Wren, but outside the reach of the debtors' creditors.

Exactly how this was accomplished will never be known. But the details make little difference. What has taken place here is precisely what the laws against fraudulent conveyances are intended to prevent: the stripping of a debtor's assets to defraud its creditors and favor its owners.

Based upon a word-by-word reading and a close study of the entire record, the Court's own appraisal of the credibility of witnesses and their demeanor, the reasonable inferences which may properly be drawn from undisputed and clearly established facts, and upon the totality of the testimonial and documentary evidence, the Court concludes that plaintiff has sustained its burden of proof—in short, the Court finds that there was a fraudulent conveyance of assets from the two debtor corporations to the defendants.

### A. The Checkmate Corporations

With the possible exception of Checkmate Automotive Centers, Inc. ("Checkmate Automotive"), all the corporations involved in this proceeding, both the debtors (Checkmate Stereo and Electronics, Ltd. and Checkmate Marketing Co., Inc.) and the defendants (Checkmate Communications Co., Inc., Checkmate Communications Co., Ltd., Checkmate Stereo & Co., Inc.), are no more than the legal personas through which the defendant Gerald Wren carries on business. Although his father is nominally the owner of Communications, Ltd. and of Stereo & Co., Inc., he is only a figurehead. All the Checkmate companies are run by Wren; they are all, in essence, one-man corporations.

To their employees, the Checkmate companies are indistinguishable one from another. Thus, Stuart Kritz, the former retail manager of Stereo's Woodside store, when asked to identify the Checkmate companies in business in 1979, replied:

"A Can I just say one thing? I never knew which company did what for who or for where. There were companies. That's all I know, and the first name was Checkmate. That's all I knew.

"Q You don't know whether there were three Checkmates or 10 Checkmates or any number in between?

"A Honestly, no."

Another employee, Lawrence Siegfried, who had started working for Stereo, continued on the payroll of Communications, then

---

6. This is the test of insolvency under the Code (11 U.S.C. § 101(26)) and under New York's Debtor and Creditor Law § 271(1).

had been put in charge of Marketing, and is probably now being paid by Stereo & Co., when asked when he ceased working for Communications, initially confused Marketing with Communications, and then burst out:

"* * * Let me get this straight, because the names are all different, but if the name 'Checkmate' is there and I again worked all the time for everybody. My checks may have been signed or typed in differently, but I didn't gear myself to who I was working for, since it was different corporations, okay, but Mr. Wren, Sr. and Jr. were the heads of both of those corporations."

B. *The Debtor, Checkmate Stereo and Electronics, Ltd.*

Of the Checkmate corporations involved in this proceeding, the first to be organized was the debtor, Stereo. It was organized, owned, and run by Wren. Its principal business was the sale of radios and stereo equipment for vehicles. It carried on its business at premises at 72–09 Queens Boulevard, Woodside, New York, leased on February 11, 1974 for a ten-year term from Al's Tire Shop. It made retail sales to individual customers from these premises, and also conducted a substantial wholesale business, supplying new car dealers with radio and stereo equipment for installation in new vehicles. The equipment sold new car dealers was custom designed to fit the make of vehicle sold by that dealer.

Audiovox, a manufacturer of radios and similar automotive accessories, supplied Stereo with product for both its wholesale and retail business.

With the help of Audiovox personnel, Stereo was accepted as a supplier of radios and similar equipment by 25 new car dealers in Queens, Nassau, and elsewhere in the metropolitan New York area. Consistent with the custom in the industry, Stereo supplied these dealers with display equipment designed to show off the Audiovox product.[7]

To support this business, Stereo had built up a cadre of experienced installers with whom it communicated with a walkie-talkie mobile telephone. So successful was this business that Stereo was either first or second in sales among Audiovox's distributors in the New York area. In the fiscal year ending September 30, 1979, Stereo had gross sales of $2,049,527; in that same period, it spent $186,711 for advertising and promotion.

Stereo's corporate identification was the word "Checkmate," which was the catchword in its corporate name, and which formed part of its "logo," an identifying mark on its stationery, invoices, and letterhead, consisting of a profile of a chess piece with the word "Checkmate" written across it horizontally. The company was customarily referred to by its employees and persons in the industry as "Checkmate Stereo," which is the way its telephones were answered. It identified itself on its stationery as a "Car Stereo and C. B. Center."

C. *The Debtor, Checkmate Marketing Co., Inc.*

Marketing was incorporated on August 28, 1975. It never issued any stock, nor were any entries ever made in its corporate minute books. Its activities were minimal until early 1979, when Wren used it as a vehicle to expand to Manhasset the type of business being done through Stereo at Woodside. Marketing leased premises at 11–70 Northern Boulevard, Manhasset, from RGR Associates for a term of ten years beginning April 1, 1979. Beginning February, 1979, between $90,000 and $94,-000 was invested in improving these leased premises, by installing carpeting, air-conditioning, new plumbing, and doing other ex-

---

**7.** The evidence is inconclusive with respect to whether these displays were bought by the individual new car dealers, or were supplied free of charge by Stereo, who, in turn, was given them by Audiovox. A display consists of a wooden cabinet with a power converter able to convert wall current to 12 volts, on which assorted pieces of equipment can be shown, as, for example, an AM–FM radio, an FM stereo radio, a radio equipped with cassette, and one with 8-track tape. In 1979, Audiovox had furnished Stereo from 20 to 25 such units.

tensive construction work. The work was paid for by money or credit supplied by Stereo. As of the end of September 30, 1979, Marketing owed Stereo in excess of $107,000.

Audiovox was persuaded to provide the new Manhasset operation with a very elaborate custom designed display panel, 8 or 9 feet in height, and 12 feet wide, constructed at a cost of $6,000 to $7,000. This display rack could display 48 different types of equipment, and had either 48 or 60 sets of speakers. Who would bear the cost of this cabinet was the subject of a running dispute between Wren and Audiovox up to the time of bankruptcy.

Starting July 4, 1979, when the new quarters opened for business, Marketing carried on the same type of business in Manhasset, as did Stereo in Woodside, the sale of electronic equipment for vehicles. Marketing became a supplier to three new car dealers, who accounted for 40 percent of its business, which consisted principally of the sale of Audiovox products. Like Stereo, Marketing employed in the manner of a trademark the profile of a chess piece with the word "Checkmate" written across it horizontally, and was identified as a "Checkmate Car Stereo and C. B. Center."

### D. *The Defendant, Checkmate Automotive Centers, Inc.*

Checkmate Automotive had apparently only a brief existence. It was incorporated sometime in 1979 to operate an automotive repair and service center in part of Marketing's Manhasset leasehold, occupying between one-third or one-half of the building leased by Marketing. Part of the premises were very suitable, because of the equipment they contained, for a company doing automotive work. Wren owns 50 percent of the stock of this corporation, of which Frank Babitt was the president.

Alone of all the Checkmate corporations involved in this proceeding, Automotive sold no stereo equipment. Its business was body work on automobiles. It did not flourish and ceased operations sometime in 1980, after Marketing became an involuntary bankrupt.

### E. *The Defendants, Checkmate Communications, Ltd. and Checkmate Communications Co., Inc.*

The record yields almost no reliable information respecting either Communications, Ltd. or Communications Co. Wren arranged for the organization of Communications, Ltd. in 1977, and in October, 1978, he claims he sold all the stock in the corporation to his father for $1,500 to $2,000 in cash.[8]

Whether or not Wren, Sr. assumed ownership of Communications, it is Wren who is the president of the company, signs its checks, and makes its decisions.

Communications shared Stereo's office, its personnel, and the services of its bookkeeper, Mary Smith, and its accountant, Harris Tunick. Sometime in 1979, a Stereo employee, one Lawrence Siegfried, became an employee of Communications, and continued as such until he went on Marketing's payroll in early 1979. Although Siegfried was Communications' only employee, its business engaged very little of his effort.

Audiovox, the debtors' supplier and principal creditor, was always led to believe that Communications was solely in the business of importing and selling cordless telephones. However, its business was not so confined. It also dealt in CB units, cigarette lighters, and stereo equipment, not all of which was imported. One of Communi-

8. No contemporary records reflect this transaction. The accountant for Communications states that he was first advised of the change when he was working on Communications' year-end reports sometime in late 1979, but just when, he does not recall. At the trial, Wren produced a stock certificate showing the assignment to his father dated October, 1978. The stock certificate did not come from the original corporate books; these have always remained in the possession of the attorney who first organized the corporation. It was only after he testified and produced the original corporate outfit from which no stock had ever been issued that Wren came forward with this single stock certificate taken from what Wren said was a subsequently purchased corporate outfit, which, however, was never produced.

cations' suppliers was Stereo, and among Communications' customers were the same franchised new car dealers to whom Stereo sold.

In December, 1978, Wren opened a bank account in the European American Bank, the same bank in which he maintained accounts for the two debtors. The only persons authorized to sign checks on that account were himself and Stereo's office manager, Mary Smith. The account was kept in the name of "Checkmate Communications Co., Inc."

Wren has taken the position that the name of the bank account is the result of a typographical error by the bank, and that the account should have been kept in the name of "Checkmate Communications Co., Ltd." In this, as in much else, the Court does not believe Wren. The use of the name "Checkmate Communications Co." was not a shortlived aberration; it was the name in which the account at European American Bank was maintained for over a year. Furthermore, the name appears on other documents for which the bank cannot be held responsible. However, for purposes of this proceeding it makes no difference whether the name "Checkmate Communications Co., Inc." is a fictitious name, or whether the corporation intended in each case is "Checkmate Communications, Ltd." For purposes of this Opinion, this Court has assumed the latter.

F. *The Defendant, Checkmate Stereo & Co., Inc.*

Checkmate Stereo & Co., Inc. was organized in January, 1980. Wren, acting on behalf of the debtor, Stereo, authorized the use of a corporate name in imitation of that of the debtor's. Stereo & Co., Inc. came into being as a device to receive the fraudulent conveyance of the assets of Marketing, hereinafter described.

Since April 1, 1980, Stereo & Co. has been carrying on in Manhasset the business formerly done by Marketing; it pays the rent and all expenses, including oil.

Wren and his father both claim that the corporation is owned by Wren, Sr. Indeed, when the Court initially asked Wren what his connection with this corporation was, Wren replied: "Right now, I'm not even an employee. I am just watching my father's interest. I am a signator on the account."

Later, when challenged about his authority to make the decision he said he was considering to close down the business, he responded that he had the authority to do so, having been appointed president of the company by his father.

G. *Relations Among the Checkmate Companies*

As noted earlier, to the employees of the various Checkmate companies, the Checkmate entities were indistinguishable from one another. Wren was the president of each one and directed its affairs. Until the Manhasset premises were opened, all the Checkmate corporations then in being were run from Wren's offices in Stereo's premises. After Manhasset opened, Communications may have moved over to Marketing's premises. Mary Smith did the bookkeeping for all the corporations; wrote checks for all of them; and Harris Tunick was their accountant.

At Wren's direction, inventory moved back and forth among the companies: from Communications to Stereo, from Stereo to Communications, from Marketing to Stereo, and from Marketing to Communications. The transfers of inventory were of sufficient magnitude to fill a truck.

Money also flowed back and forth. Prior to September 30, 1978, Communications evidently owed Stereo more than $60,000. Deposits from Stereo supplied almost all the funds for the account maintained by Communications at European American Bank, out of which Siegfried's salary and other expenses of Communications were paid. As of September 30, 1979, Communications owed Stereo $22,000. Stereo's credit was also used to finance Marketing's operations; Stereo guaranteed Marketing's credit, and also lent it money.

In one curious set of transactions, money was drawn out of Communications, entered

in Communications' books as a loan to Wren, Sr., while Stereo's books show contemporaneous receipts from Wren, Sr., also by way of loans. Thus, Wren, Sr. appears to have served simply as a conduit of monies from Communications to Stereo. Thirty thousand of the $45,000 allegedly owed Wren, Sr. by Stereo, discussed hereinafter, consists of transactions of this character.

Only Wren knows the full extent of the various intercompany transactions, or the reasons for them. They cannot be reconstructed from the records because these records are incomplete. Marketing's records are missing almost entirely, and critical records of Stereo, like its general ledger, are also gone.

## H. The Transfers to Communications

In September, 1979, although both Stereo and Marketing were insolvent in the bankruptcy sense they owned substantial assets.

The balance sheet of Stereo as of September 30, 1979 shows cash in the amount of $88,997, accounts receivable in the amount of $79,633, and inventory in the total value of $365,263. It had other assets, as well: furniture, fixtures, and leasehold improvements of a value of over $25,000 before amortization; communications equipment consisting of a mobile telephone unit used to communicate with installers in the field, and a base station valued at over $9,000; leases of motor vehicles which included an option to purchase; and deposits of $180 with Con Ed and $150 with New York Telephone.

Its balance sheet did not reflect the value which necessarily inhered in Stereo as a going concern, or the goodwill which it had built up by sales and advertising over a period of years.

Marketing, although also insolvent, was not without tangible assets. Chief among these was its leasehold interest in property, in which $90,000 in improvements had just been invested. In addition, its September 30, 1979 balance sheet shows cash on hand over $15,000, and fixed assets, including furniture, fixtures, and an automobile, in excess of $20,000. Not shown on the bal-

ance sheet was the inventory then on hand. Nor is it clear that the balance sheet reflects the value of the display cabinet furnished by Audiovox.

Stereo's largest liability was $496,100 in accounts payable. The bulk of this money was owed Audiovox and had been owed for about two years.

In November, 1979, Audiovox, which had been growing increasingly restive over the monies owed it by Wren's two companies, began pressing him very hard to reduce that debt. They insisted that some payment be forthcoming no later than December, taking his note payable that month to that end.

On December 20, 1979, Wren took the first of a series of steps which would ultimately put Communications in possession of all of the assets of Stereo and Marketing. He transferred to Communications both (1) the lease on the Woodside premises, and (2) the right to use the " 'Checkmate' name and logo."

The various documents executed in connection with this assignment all differ with respect to the consideration received by Stereo. One assignment, purportedly executed December 20, 1979, that day, by Wren, acting on behalf of both corporations as their president, describes the consideration as $5,000. Another more formal document, also dated December 20, 1979, describes the consideration as forgiveness of a debt due Wren, Sr. from Stereo in the amount of $45,000. This second document also provides that Wren, Sr. will pay Stereo $10,000 as "reimbursement" for all security deposits and goodwill. Under Stereo's agreement with its landlord, it deposited monthly a stipulated amount on account of the security, and in December, 1979, this deposit was over $7,000. Thus, apart from the purported discharge of the antecedent debt owed Wren, Sr., the sole consideration received by Stereo for its lease and the loss of the exclusive right to the use of its name and logo was $3,000.

The $10,000 was paid Stereo by a check drawn on the account maintained in the

name of Communications Co., Inc. in the European American Bank. This was the bank account which had been funded up to September, 1979 almost exclusively by checks drawn on Stereo.

The agreement transferring the lease gave Stereo the right to remain in the premises:

"CHECKMATE STEREO & ELECTRONICS, LTD., shall give the right to remain at the assigned premises, at its own expense, until such time as it acquires a new premises, but in no event shall CHECKMATE STEREO & ELECTRONICS, LTD., remain at the assigned premises for a period of in excess of nine months from the date of the assignment."

The December 20, 1979 assignment of Stereo's lease to Communications, Ltd. resulted in no change in the manner in which business was conducted at the leased premises, nor in the appearance of those premises. Six months later, the only visible references to Communications, Ltd. at the Queens Boulevard store was a small sign above the office door, and another, behind the cash register. Some decals referring to Communications, Ltd. were smashed when its glass entrance door was broken on March 26, 1980. After the assignment, just as before, Stereo continued to pay the rent on the building, the rent on the sign on the roof, to make the security deposits, and to pay the bills for telephone and electricity.

Nor did the transfer appear to reduce Stereo's claimed indebtedness to Wren, Sr. When the debtor filed its list of creditors, Wren, Sr. was listed as owed the very $45,000 allegedly given up in exchange for the assignment of Stereo's lease.

In November and December, 1979, Stereo transferred inventory to Communications of a total value of $23,996. Later, Marketing, in February, 1980, conveyed to Communications inventory of a value of approximately $10,000. At the trial, Tunick produced three invoices purporting to show sales of $22,000 by Communications to Stereo in February and March, 1980.

In January, 1980, Wren began laying the groundwork for replacing Marketing in the Manhasset store. That month, he caused the organization of Checkmate Stereo & Co., Inc. In the name of Stereo, as noted earlier, he advised the Secretary of State that Stereo had no objection to this new legal entity adopting its corporate identification.

That same month, Wren instructed the managers of the retail operations at Woodside and Manhasset not to let any deal walk, i. e., to sell at whatever price was necessary to make a sale. Wren told them that "he was having some financial problems, and he needed to raise capital dollars for the business, otherwise we might have to go bankrupt."

In March, 1980, Wren began perfecting the various transfers. The original lease between Stereo and Al's Tire Shop prohibited its assignment or subletting without the landlord's written consent. No such consent had been secured with respect to the December 20, 1979 assignment. Accordingly, a new assignment was drawn, this time running to Communications Co., Inc. to take effect April 1, 1980. Again, Wren signed on behalf of both Stereo and Communications. The assignment explicitly provided that Stereo was not relieved of the liability under the lease; the landlord's written consent was endorsed this time to the assignment. As in the case of the earlier assignment, Stereo continued to pay the rent directly to Al's Tire Shop, Inc., doing so through April, 1980.

On February 8, 1980, Communications bought Marketing's lease from it for $5,600. Then, or the following month, Wren wrote the lessor, RGR Associates, that Marketing was no longer able to pay the rent. As the result of this letter, RGR Associates was induced to enter into a new lease with Communications identical in all respects with that which Marketing had held, except that Communications forfeited the reduction in rent for the year beginning April 1, 1980 that Marketing would have received.

Wren signed the new lease on behalf of Communications as its president.[9, 10]

At the same time as Wren transferred Stereo's and Marketing's leases to Communications, he also ostensibly sold all their property needed to carry on their business operations.

On March 4, 1980, Communications Co. bought all Marketing's office furniture, tools, and display equipment for a stated consideration of $10,000. Transferred to Communications Co. were, among other things, six desk chairs, two drawer file cabinets, a small secretary desk, a coffee table, and all inside and outside signs. All the equipment necessary to an operating business, except inventory, was included on the invoice prepared in Wren's office. The prices given on the invoice were decided by Wren together, he says, with his father and members of his staff, based on the original cost and age of the equipment. Stereophonic equipment and radios included in the transfer were assigned prices by Wren below their wholesale cost. Included in the equipment transferred was the large custommade display cabinet which Audiovox had specially built for Marketing. No notice was sent any of the creditors of Marketing of this transfer of everything on the premises at Marketing.

A check has been produced, issued by Communications, drawn on Chase Manhattan Bank under date of February 29, 1980 and made payable to "J. Wren," which was deposited in Marketing's bank account on March 3, 1980, and which purports to represent the payment recited on the March 4, 1980 invoice.

The following day, on March 5, 1980, Stereo made an identical sale. It transferred to Communications Co. its furniture, tools and and display equipment in exchange for a stated consideration of $11,000. Included were 29 ceiling fluorescent fixtures, cash register, two secretary's desks, assorted file cabinets, telephone answering machine, 68 radios, and 17 CB units. Again, no notice was given to Stereo's creditors of this transfer.

Stereo was allegedly paid for the furniture and fixtures transferred on March 5 by checks spanning the period from December 6, 1979 to February 19, 1980, evidenced by checks or deposit slips reflecting the deposit of checks from Communications. The $11,000 allegedly was made up of two checks from Communications for $2,500 and $2,000 dated January 2 and 3, 1980, and two deposits, one on December 6, showing a $5,000 check, and another on February 19, showing a check for $1,500.

Wren's explanation of the assignment of Manhasset's lease to Communications was that he "elected to get out from underneath the responsibility of the rent and maintenance of the building." He wanted "[t]o solidify the Queens operation to minimize my indebtedness." As for the Queens lease, he wanted to "find different quarters where I could minimize my rental factor and maintenance and perhaps get into an area with lower overhead with more room for parking and so on. I just didn't find it adequate."

The transfer of all of Marketing's and Stereo's fixtures and equipment to Communications caused no difference in the operations of either business. Nothing appeared changed.

Following these transfers, on March 18, 1980, at the time when neither Stereo, nor Marketing, had any longer a right to remain in the premises in which it was operating, and when neither owned the furniture or fixtures they were using, a meeting was held between Wren, his attorney, and the representatives of Audiovox in the office of an attorney for Audiovox. At that

---

**9, 10.** Marketing's lease limited the tenant's right to assign or sublease to an organization of which Wren was a 25 percent stockholder.

Like the prior lease to Marketing, the new lease limited the tenant's right to assign or sublease to an organization of which Wren is a 25 percent stockholder.

time, $374,590.31 was owed Audiovox by Stereo. Wren and his attorney informed Audiovox that both companies were insolvent. Wren offered to pay Audiovox $100,-000 if, in return, it would forgive the balance of the debt owed by the two corporations. Neither Wren, nor his attorney, said anything respecting the transfer of the leases and of the furniture and fixtures formerly owned by Stereo and Marketing.

Audiovox was not told that the elaborate display which it had furnished Marketing, and for which it was still seeking payment from Wren, was now the property of another company. Indeed, until the trustee in bankruptcy was appointed, Audiovox thought Communications was engaged solely in the cordless telephone business. Ignorant of the evaporation of Stereo's and Marketing's assets, Audiovox continued to supply Wren with product. However, on April 8, 1980 Audiovox wrote Wren that it would no longer do business with him. Nevertheless, it agreed to supply him merchandise of a value of $9,285.16 on a C.O.D. basis.

Other creditors, however, began closing in. On March 25, 1980, J.I.L., an unpaid supplier, attached Stereo's bank account at the European American Bank. As a result, the accounts of both Marketing and Stereo were closed down. Stereo continued to operate, nevertheless, after a fashion, using the bank accounts maintained for Visa and Master Charge payments. But Wren closed out Marketing immediately. He had anticipated just such a development by having Communications' lease with RGR Associates begin April 1, 1980.

### I. *Marketing Shuts Down*

The very day that Marketing's account in the European American Bank was closed down, Wren instructed Siegfried, who was in charge of the Manhasset operations, to pack up and remove everything from the store. Siegfried was told they were going to put together a new business. Siegfried, Wren, and Marketing's bookkeeper then packed everything on the premises into large cartons.

According to Siegfried, he removed "all the car stereos, CBs, speakers, amplifiers, everything that was salable merchandise, and all of the records from the office area." These records included the "billing that we did with our car dealers, the retail sales receipts, the ledgers, checkbooks, everything." The only things he left behind were the fixtures, the carpeting, and the lighting.

The office records filled three large cartons. Almost all the inventory that was packed up consisted of new Audiovox equipment with a total value of approximately $40,000.

The cartons, when packed, were loaded into two vans; Siegfried drove one, and Wren the other. They left together for the Woodside store, Wren arriving some 20 minutes after Siegfried. Wren, Siegfried, and Stuart Kritz, the Woodside manager, unpacked the cartons, assisted by others. Each van took about 15 minutes to unload. The cartons were all left in the front of the Woodside store, from which they allegedly were stolen that very night.

When Marketing's Manhasset premises reopened on March 26, 1980, there was nothing left at the premises but the fixtures and furniture belonging to Communications. When the installers reported for work, they were sent home; customers who inquired were told that the store was changing over its inventory plan, or given some other "cockamaimy excuse."

On Friday morning, however, business resumed as usual, except that the product now being handled was manufactured by Clarion, rather than Audiovox. The telephone numbers were the same, and remained the same. All Marketing's telephone numbers were ultimately transferred to Stereo & Co., which took over the operation of the business beginning April 1, 1980. Just as before, the business is identified as a "Car Stereo and C.B. Center."

The installers and sales people who had worked for Marketing simply continued to work for whatever Checkmate corporation was now running the business. Marketing's

bookkeeper became the bookkeeper for the new enterprise; Siegfried continued working exactly as he had before.

So invisible has been the change even to Siegfried, who participated in it, that when asked how long he had been "the general manager of the Manhasset store for Checkmate Stereo," he answered, "Since the store opened July 5th last year." Asked whether his duties had changed in any manner from what they had been in January, February, and March, 1980 (when Marketing was the operator of the Manhasset premises), compared with now, he answered: "Only inwardly to myself, though I am under more stress now, because we're not producing any sales."

Overnight, Wren had substituted for the insolvent Marketing a wholly new corporation against whom Audiovox and Marketing's creditors had no rights.

According to Wren, Marketing continued to function to the extent of continuing to collect its accounts receivable.

## J. *The Debtors' Wholesale Business*

The bulk of the business of the two debtors had not been their retail sales, but the wholesale business done with new car dealers. This business Wren arranged to take over himself on a commission basis.

On April 24, 1980, he entered into an employment contract with Eastern Auto Sound, a division of Clarion Corporation, a major competitor of Audiovox, to sell their custom auto radios to new car dealers in Brooklyn, Queens, and northern Nassau. The agreement was to last for three years, commencing on May 1, 1980. The following day, Wren visited each of Stereo's wholesale customers to tell them that he would *no longer be selling them* Audiovox merchandise.

On May 5, 1980, Wren, this time accompanied by a representative of Eastern Auto Sound, again saw each of the franchised new car dealers who had been buying from Stereo to persuade them to shift their business to Eastern. Left with each dealer was a letter promising that "Mr. Wren and his

staff, who you have been working with for many years, will be working with you as they have always done in the exact same manner * * *."

This apparently is what occurred. Wren continued to dispatch the installers in the exact same manner as before. One installer believed he was working for Eastern Auto Sound; another did not know for what company he was working.

The display cabinets at the new car dealerships, sold or given by Stereo for the display of Audiovox equipment, were now used to show off Clarion merchandise.

## K. *The Bankruptcy Proceeding*

On April 25, 1980, Audiovox brought a petition in involuntary bankruptcy against both Stereo and Marketing, which together owed it over half a million dollars. On May 1 or 2, 1980, all Stereo's employees were shifted to Communications' payroll. That day, Stereo, like Marketing, became an empty shell and a non-functioning business.

Ignorant of these developments, Audiovox, on May 12, 1980, brought on for hearing, by order to show cause, an application to put an interim trustee in charge of the business of the two companies.

Although at the time of the hearing, Marketing had been out of business for nearly six weeks and Stereo had ceased to function some days earlier, Wren carefully concealed these facts. The answers he gave to the questions put to him during the course of the hearing, as partially indicated by the excerpts below, were calculated to keep that information from the Court and the creditors:

"THE COURT: How much inventory do you actually have on hand, the total, all kinds—Panasonic, Pioneer?

"THE WITNESS: I would venture a guess and say that it was somewhere around—it's under $200,000. I don't know exactly.

"THE COURT: Is that both locations?

"THE WITNESS: Yes, ma'am.

    *    *    *    *    *    *

"Q Doesn't Checkmate Marketing operate in Nassau?

"A   That's correct."

In support of the need for an immediate appointment of an interim trustee—whose function is similar to that of a receiver—Audiovox referred in its moving papers to a transfer of the assets of the debtors.

At the hearing on the application, the Court sought to determine the facts itself from Wren. As now admitted—indeed, as insisted upon—by Mr. Wren, on March 25, 1980, everything movable in Marketing's premises not earlier sold to Communications was loaded on two vehicles and taken to Stereo's premises where Wren, himself, together with other men, unloaded it. Further, according to Siegfried, no invoice covering the goods sent Marketing was drawn up because the transfer was recognized as exceptional and not in the nature of a sale. While all of this was necessarily known on May 12, 1980 to Wren, none of it was known to the Court which, seeking to ascertain the facts, asked Wren, who was under oath:

"THE COURT: There was a reference to a purchase by Checkmate Stereo from Checkmate Marketing.

"THE WITNESS: There was no purchase.

"THE COURT: There was no purchase?

"THE WITNESS: No.

"THE COURT: Was there any transfer of inventory from one company to the other?

"THE WITNESS: No. There were, during the course of its business, exchanges of merchandise, which has been paid for in both cases, for merchandise then returned, all documented. There has been no bulk sale of any sort."

The Court, sensitive to the difference between the denial of a bulk sale and the information for which it was pressing, whether a transfer had taken place then repeated its question:

"THE COURT: No bulk transfer?

"THE WITNESS: No, ma'am."[11]

No receiver was appointed that day, and the hearing on the application for an appointment of a receiver was adjourned to May 15, 1980.

At the adjourned hearing, although the debtors consented to adjudication, counsel for Wren, with defendant sitting by his side, explained to the Court and the creditors why it would be improper for the trustee to take over control of the premises at which Stereo had been operating:

"All of the inventory of the two debtors is now located in one premises, in the Queens premises. There is nothing in the Nassau store anymore. It is all there. This store in Queens has been operated by two companies, one of which is one of the debtor's and one of which is another separate company. It happens to be a company of which Mr. Wren was an owner about a year and a half or two years ago. It is a company that sells telephone equipment. It does not sell the same equipment as the debtor. It sells telephone equipment. About a year and a half or two ago, Mr. Wren advised me he sold or transferred that company to his father because he had run into some financial difficulties and couldn't operate it anymore. Since that time, the two companies have operated at the same premises. They don't mix inventory. It has different types of inventory, but they do operate from the same store. That company the name of which is Checkmate Communications. It has the same name, Checkmate, because Mr. Wren did own it at one time.

"That company would find that it would be a severe interruption of busi-

11. Wren, who is a sophisticated businessman, has throughout these proceedings scrupulously insisted on the difference between a "sale" and a "transfer." When an intercompany transaction for which consideration allegedly passed has been described as a "transfer," Wren has immediately pointed out that what was involved was a "sale." Thus, when asked whether any transfers had been made that were not in good faith, Wren replied: "There were no transfers. There were sales, and there was nothing done in bad faith whatsoever. Everything was done in good faith."

ness, if not worse, if an auction sale was conducted on those premises.

"What's more, that company for the last 30 days has allowed the debtor to stay on the premises rent free. And I think is also picking up some telephone expenses."

Later, when the attorney for Audiovox sought to secure some information respecting Communications, the following colloquy took place:

"MR. STRUMPF: Mr. Wren doesn't have anything to do with that company, your Honor.

"MR. WREN: I work as a salesman but I don't own the company."

From first to last, the statements made by counsel, presumably based on information furnished by Wren, were not consistent with the truth. At least as early as January, 1980, Communications was selling the same merchandise as Stereo, and starting May 1 or 2, 1980, was conducting exactly the same type of retail business as had Stereo from the Woodside premises, even to employing precisely the same employees. Communications had not been allowing Stereo to stay on the premises rent-free; through May 1, 1980, Stereo had been paying the rent and all other bills. Far from being only a salesman, Wren has at all times been the president of Communications, signs its checks, and, at the very least, shares chief executive responsibility over its business.

The statements of counsel did not relate to a peripheral matter. They were directed squarely to the authority of the trustee to take possession of the debtors' assets. They show what a barrier Communications represented to the exercise by the creditors of their rights under the Bankruptcy Code.

### L. The Assets Available to the Debtors' Creditors

When the trustee in bankruptcy, following his appointment, went to the premises of Marketing and Stereo to take possession of their assets, he came back empty-handed.

Although the Manhasset premises looked exactly as it had when Marketing was operating it, the inventory was of the same character and the showroom looked the same, the bankruptcy trustee was told that nothing whatsoever on the premises belonged to the debtor, not even the display board which Audiovox had furnished Marketing.

At Woodside, the trustee was told that the only property belonging to Stereo was the inventory stored on the second floor. To the experienced eye of Audiovox's district sales manager, Melvin Schwam, who accompanied the trustee, 80 percent of that inventory appeared to be used. At least 50 percent of the merchandise was not even in boxes, indicating that it was either a repaired or a used radio needing repair. Whether this used merchandise was operative or not, could not be determined by simple inspection. "It was an incredible amount of merchandise that was there, to be in a not new condition. It wouldn't have surprised me at all to see that much brand new merchandise. It is entirely conceivable that it was there, but to see that much merchandise in an open condition, startled me." Schwam estimated that what he saw there would have been worth, if new, no more than $150,000.

When the inventory was removed from Stereo's premises, it filled the whole of one truck and part of a second.

The new inventory in the showroom and in the first-floor storage room which appeared to Audiovox's district sales manager to be precisely like the merchandise that Stereo had been selling was, the trustee was told, the property of Communications. On the instruction of Wren, the parts manager refused to give the trustee and the Audiovox representative access to either area. Thus, they were unable to inspect the property claimed to belong to Communications, the quondam telephone equipment company.

Despite the restrictions put on them, Audiovox's employee was able to observe that the walkie-talkie radio station and base stations that had previously been used by

Stereo in the conduct of its field installation business were now being employed exactly the same way by the ongoing business.

When Marketing subsequently filed its bankruptcy schedules, it showed as its sole asset a deposit of $500 in the National Bank of North America. Stereo's schedules listed as assets $6,000 on deposit in two banks, $33,888.80 in accounts receivable pledged to European American Bank, and inventory of a value of $200,000.

According to the schedules filed in the bankruptcy proceedings by Wren, Marketing's inventory, books, and records, and some of Stereo's inventory, its general ledger, "some check stubs and invoices and records," plus $3,500 in cash and $7,000 in checks, were stolen in a burglary which took place on March 25, 1980 at Stereo's premises in Woodside, New York.

### M. The Burglary

The total disappearance of Marketing's inventory and records, and of critical records of Stereo, is inadequately accounted for by the March 25–26, 1980 break-in at Woodside.

Kritz, the retail manager of the Woodside store, testified that he was called in the early morning hours of March 26, 1980 by Checkmate's security service and told that there had been a break-in; when he arrived at the store at 3:00 a. m., he found the glass front door smashed, a variety of equipment missing, and a storeroom ransacked; surveying the damage, he told the two police officers on the scene that approximately $15,000 in equipment had been stolen. The following day, he increased this figure to $20,000.

The defendants have proffered the burglary as explaining the disappearance of all of Marketing's inventory, of virtually all of Marketing's records, and of Stereo's general ledger. According to the witnesses called by them, at the time of the break-in, all of Marketing's inventory and records were in cartons at the front of the Woodside store, having been taken there earlier that day, and they were all stolen during the course of this chance break-in.

Since Siegfried had packed the cartons alleged to have been stolen, and Kritz had helped unload them, their testimony regarding this burglary should have meshed, like two halves into a single whole. Instead, they were in square conflict on every critical fact. Siegfried thought the burglary had occurred on March 25, 1980, which was a Tuesday, because that being the day of the week on which the stores closed earlier, he recalled that when they arrived at the Woodside store, "it was maybe 6:10 or so, and everybody wanted to get out, and we dumped everything at the other store right in the front area, locked up and good-bye." Kritz, on the other hand, placed the burglary on "March 28th, which was a Thursday evening," adding it "was a Friday morning, Thursday evening-type thing."

More important, they were in total disagreement as to the character of the cartons transferred. Checkmate's merchandise apparently arrives from the factory in large master cartons, which are then broken open, and collapsed, to be kept in the backroom, or thrown out. These used cardboard containers were used to pack up Manhasset's inventory, books, and records. To quote Siegfried, what he and Wren transported "was unmaster cartons."

After the cartons were packed, they were sealed with a sealing tape containing the Checkmate logo. Using a black Magic Marker, Siegfried identified the contents of each carton in a corner. A box containing three CBs, two 8-tracks, and five cassettes would be marked "3 CBs, 2 8-tracks, 5 cassettes." The three large cartons containing the office records were marked "Checkbook," "Statements," etc.

But while Siegfried delivered "unmaster cartons," what Kritz unloaded were factory-fresh master cartons:

"THE COURT: Were these master cartons as they appeared from the factory cr were these master cartons as they were utilized in Manhasset?

"Were these repacked master cartons?

"THE WITNESS: Most of them were not, no.

"THE COURT: Most of them were not what? Most of them were not repacked?

"THE WITNESS: Right, correct.

"THE COURT: Most of them were as they came from the factory?

"THE WITNESS: Correct.

"THE COURT: That was true of both vans?

"THE WITNESS: I believe so, yes."

Corroborating Kritz's testimony that the inventory delivered from Manhasset was factory-fresh merchandise, not repacked goods, books, and records, is the fact that when he was initially asked whether anything "out of the ordinary, had occurred on the day prior to the burglary," he answered, "No. Business conducted as usual. We had deliveries throughout the day. As a matter of fact, some merchandise didn't [sic] come in from our Manhasset store. Other than that, it was a routine day." So far as he was concerned, the delivery was just part of the two stores' routine exchange of merchandise.

Further, while Siegfried testified that each box had been labeled as to its contents with a black Magic Marker, Kritz claimed total ignorance of what the boxes contained, except for one open carton:

"Q These were sealed so that you couldn't see the contents; is that correct?

"A That's correct.

"Q They could be bricks for all you know?

"A No, they weren't bricks.

"Q How do you know they weren't bricks?

"A We were told that radios and merchandise were coming over, and that was what had happened.

"Q You were told?

"A Yes.

   *     *     *     *     *     *

"Q Of course, some were open?

"A Right. There was one box that didn't have a flap on it or whatever and I saw three radios in there.

"Q When you say, 'one box,' were the vast majority then sealed in these master cartons?

"A Yes, the vast majority were."

Although Siegfried had labeled three cartons as containing office records, Kritz saw no books or records.

But the most blatant disagreement related to the record kept of the merchandise transferred. Siegfried flatly denied preparing any invoice covering the inventory transferred, although he acknowledged that an invoice normally accompanied intercompany transfers:

"Q Did you make up an inventory of all these goods that you packed in the cartons?

"A I did it in a military fashion of inventory. Everything on the cartons themselves, what the cartons contained.

"Q You didn't make a separate list?

"A No.

"Q Wasn't it the custom when there was an intercompany transfer, to make up a receipt or an invoice type statement?

"A Yes, but this wasn't considered to be an intercompany transfer of merchandise. This was being separated or segregated and being brought over for a specific purpose.

"Q To give it to the trustee in bankruptcy?

"A Yes. Every crate, carton or container had the item, what was in there, and they were sealed so that nothing could fall out or be added in. Now, after we brought the stuff there, I would have supposed that the following day, under normal business hours, employees of the other store could have physically made up a list of what we had written on the outside of the cartons, Mr. Wren and myself."

Kritz was equally certain of the exact contrary: that the customary papers had accompanied a delivery which, to him, appeared to be a normal intercompany transfer of factory-fresh merchandise:

"Q When there were shipments from one Checkmate to another Checkmate, were there invoices or tickets itemizing what was being transferred? Did that accompany these shipments? I will call them intercompany shipments.

"A   Yes.

"Q   Did you sign off on an intercompany ticket receipting these goods?

"A   I wouldn't sign for anything I didn't check, so I didn't check it, so I wouldn't sign it, *but I told them I would check it first thing in the morning and then I will sign it and send it out to them.*

"Q   *It was presented to you?*

"A   *Right,* but I could have put it as well onto the box or I could have put it somewhere else.  I don't know what happened to it.

"Q   That was only one of many copies; is that right?  That was the one that accompanied the transfer.  There would have been an original record somewhere back at the Checkmate in Manhasset; is that correct?

"A   Okay.  I don't know.  I don't know their procedures over at that other store. I don't know what their records were."
(Emphasis supplied.)

But as fatal to the claim that Manhasset's inventory and records were clandestinely removed from the Queens store is Kritz's testimony of his reaction when he was alerted early in the morning of March 26 that a burglary had taken place at Queens.

What the defendants would have us believe is that when Kritz went home that night, there had been left, to the right and to the left of the front door, cartons bulky enough to fill almost two trucks.  It had taken several men 15 minutes to empty each of the vehicles.  Certainly, the disappearance of cartons which must have filled the whole front of the store should have been the first thing that would have struck Kritz had they, in fact, been left there. Yet, when Kritz was initially asked what he had observed upon arriving at Woodside, he made no reference to Manhasset's cartons. What he saw, he said, was that "the entire CB area was wiped out clean of merchan-

dise, there was nothing left on the shelves. Speakers and radios behind the counter were taken, also."

Not a word from Kritz, not even any recognition of the total disappearance of the monstrous number of cartons presumably left sitting on either side of the front door just a few hours earlier, all of which he had helped unload.

When Wren's counsel, clearly dissatisfied with the answer, asked Kritz whether, subsequently, he "made any further observations concerning these losses of property," Kritz, bethought himself of the fact that he had "looked into the stockroom," that he had "looked in there to see if there was a break-in from that point," and that after he saw no break-in, he "wasn't concerned with the stockroom, although it was ransacked also."

Leaving the burglary temporarily, about which Kritz, unaided, could apparently only recall that some radios had been taken from the showroom, defendants' counsel then shifted to the delivery of the merchandise from Manhasset that day.  Having established the delivery from Manhasset, defendants' counsel next inquired:

"Q   When you called that evening because of the burglary, did you observe whether that property was still there?"

So prompted, Kritz suddenly recalled that cartons nearly filling two trucks had indeed been stolen, and not simply some radios from the showcase:

"A   That property was not there.  That was part of what was initially taken from what I could see in the showroom area."

A man who has to be reminded that when he left, there were two truckloads of merchandise sitting in the front of the store, and when he returned, they were gone, is not a man who is telling the truth.[12, 13]

---

**12, 13.**  The obvious explanation for this curious lack of observation, and for Kritz's preoccupation with the stockroom earlier, is that when the brand-new, factory-fresh merchandise from the Manhasset store arrived, it was put where it belonged, which was in the locked storeroom, and that its disappearance was not remarked by Kritz when he arrived because he did not expect to see it there.

Furthermore, the circumstances of the burglary suggest that the intruders had relatively little time in the store. When the alarm was first tripped, the store appeared normal. The police surmise that the thieves, after gaining entry to the store through breaking the plate glass door which set off the alarm, closed the steel gate behind them, leading the police to believe the alarm to have been a false one. When the police returned about 20 to 25 minutes later, the gate was up and the burglars gone. The intruders could not have removed anything while the steel door was down; they had to act in the 20 minutes between the time the police left and when the police returned. It had taken three men at least one-half hour to carry Manhasset's cartons into the store. How was it possible for these later arrivals not only to remove all the boxes in less time, but to take inventory off the shelves, ransack the storeroom, and yet have time left to steal cash, checks, and books from Stereo's office?

It is probably true that on the night of March 25, 1980, a great deal of inventory was transferred from Manhasset to Woodside; it seems likely that, as Kritz testified, the bulk of it was brand new merchandise in its original factory cartons. It also seems likely that all of Manhasset's books and records were removed at the same time, but there is no evidence that they ever arrived at Woodside. Kritz never saw them, despite the fact that they occupied three large cartons all clearly labeled.

Indubitably, there was a disturbance of some character at the Woodside store following the arrival there of the Manhasset merchandise: the front door was smashed and the interior messed up. But there is no evidence of any probative value as to what, if anything, was taken from Manhasset by whoever smashed the front door. There is certainly no probative evidence that these fortuitous marauders stole everything removed a few hours earlier from Manhasset.

Totally incredible is the claim that garden variety burglars would have bypassed stereo equipment and other salable items in the showroom in order to steal Stereo's general ledger worth less than yesterday's newspaper.

Further undermining the claim that Marketing's records were part of an accidental catch are several facts. First, Wren testified that following the take-over of Marketing's businesses by Communications, Marketing continued to function to the extent of collecting its accounts receivable. How could it have done so if its records were all stolen? Second, among the documents Wren has produced to prove that fair consideration passed for the assets transferred are deposit slips of Marketing. Why are they available, but everything else is not?

The Court does not believe that Wren ever lost possession of the records of Marketing, the general ledger of Stereo, and the inventory of Marketing to some chance thieves. Stereo's smashed door constitutes an inadequate explanation for the disappearance of all of Marketing's records and of at least $40,000 in brand new inventory.

Wren, having failed to furnish an adequate explanation for the failure to turn over to the trustee the records of Marketing and the general ledger of Stereo, it may properly be inferred that they contain evidence detrimental to him.

### N. *The Missing Inventory*

At the trial, the plaintiff, the trustee in bankruptcy, established through documentary evidence the transfer of the leases and the fixtures and equipment. To establish the concurrent transfer of the inventory, he called an expert witness to establish what inventory Stereo should have possessed when its assets passed into the hands of the trustee. This expert witness, Ivan Babitt, a certified public accountant, had made an analysis of the records of Stereo for this purpose. No similar analysis could be made for Marketing because all the records of that company were gone.

Babitt employed a method known as the "gross profit" method. This is an acceptable method for the purpose of determining inventory, is accepted as such by the Inter-

nal Revenue Service, and Mr. Jack Weisbaum, an expert called by the defendants, confirmed that it is an appropriate method in investigating possible fraud, although he deemed it inconclusive.

Roughly speaking, the gross profit method permits a calculation of the value of the inventory that should be on hand at a particular point in time by calculating the inventory represented by sales during the period being measured. This calculation is made by use of the company's usual gross profit. It is assumed that all the sales made during the period included the company's usual gross profit. Reducing the sales dollars by that customary gross profit yields the value of the inventory sold. This figure is then subtracted from the sum of (1) the inventory on hand at the beginning of the period, and (2) all purchases during the period, to arrive at the inventory that should have been on hand at the end of the period.

Thus, in the period between September 30, 1979 and April 25, 1980, Stereo had net sales of $799,804. To make such sales, selling at its usual markup of 30 percent, would have required inventory of a value of $559,863. Subtracting this figure from the sum of inventory on hand at the beginning of the period ($365,263) and all purchases during the period ($630,770), which together equal $996,033, yields the inventory that should have been on hand, $436,170. Correcting for the inadvertent omission of the sales tax and for the $20,000 in inventory allegedly stolen from Stereo during the break-in reduces this figure to about $390,000. This represents the value of the inventory that Stereo should have had on hand when it was adjudicated, according to Mr. Babitt.

Mr. Babitt in his calculations assumed that Stereo during the period beginning October 1, 1979 and ending April 25, 1980 sold at its customary markup. For each of the three years ending September 30, 1979, Stereo's income tax returns showed a gross profit of 30 percent or higher. In the last year of that period, gross profit rose to 34 percent. Mr. Babitt, therefore, assumed a gross profit of 30 percent.

Most of the figures used by Mr. Babitt were derived directly from the records maintained by Stereo. Thus, the beginning inventory was taken from Stereo's September 30, 1979 balance sheet. Some figures, however, Mr. Babitt was forced to derive by a simple arithmetical calculation from otherwise known figures. He called this technique "backing into" a figure.

Although defendants' expert, Jack Weisbaum, was critical of certain figures used by Mr. Babitt, and rejected the technique of "backing into" employed by Mr. Babitt, his own calculations, to a large extent, corroborated the results reached by Mr. Babitt. Despite all Mr. Weisbaum's differences with Mr. Babitt, their intermediate figures were strikingly similar. What is even more significant is that Mr. Weisbaum agreed with Mr. Babitt that if Stereo had continued selling at its customary gross profit, the inventory on hand on April 25, 1980 would have had a value well in excess of $300,000.

As already noted, Mr. Babitt had concluded that the inventory on hand on April 25, 1980, assuming a 30 percent gross profit, should have had a value of approximately $390,000 after certain corrections. Mr. Weisbaum put the inventory figure, assuming sales at a gross profit of 30 percent, at $337,000.

The inventory turned over to the trustee in bankruptcy by Stereo fell short of either figure. According to Stereo's schedules, its value was $200,000. Mr. Schwam estimated its value, if new, as only $150,000. In his opinion, and he was an expert observer, 80 percent of it was not new. This means that only about $30,000 worth of new inventory was turned over to the trustee, whereas Stereo should have had inventory worth between $337,000 and $390,000, assuming sales at its customary gross margin.

The defendants have sought to invalidate the results reached by the gross profit method by pointing out that it is based on the assumption that Stereo continued to operate on a 30 percent gross margin, for which they claim there is no support in the

evidence. Indeed, Kritz, who was Stereo's retail store manager, testified that Stereo operated during the critical period on a gross margin that fell as low as 5 percent. Parenthetically, even that low a gross margin would result in unaccounted inventory based on the figures of defendants' own expert. At that gross margin, his figures would yield a closing inventory of $178,000, whereas Schwam saw merchandise which, if new, would have had a maximum value of $150,000, and of which 80 percent was used.

But Kritz's testimony is entitled to no credence. Cross-examination developed that he confused net and gross profit and believed the latter to be the excess of returns over all costs, including labor, rent, etc. A 5 percent net profit is not inconsistent with a 30 percent gross profit.

Furthermore, Kritz, to document his claim that Stereo was selling at a reduced gross margin, described in detail the effect a change in the FCC regulations had on Stereo's sales during Christmas 1979 of 23-channel CBs. But the change had taken place so long before 1979 that when Siegfried began working for Stereo in April, 1978, it no longer even had any 23-channel equipment on hand. Even if it is assumed, as both Kritz and Siegfried agreed, that CB sales during Christmas 1979 were disappointing, since CBs represented only 15 to 20 percent of Stereo's business, a drop-off in their margin would not have cut very deeply into Stereo's overall gross margin.

According to the figures of the debtors' own expert, even if Stereo's margin had dropped as low as 20 percent, Stereo should have had on hand on April 25, 1980 inventory of a value of $258,616.31. If a margin of 25 percent is assumed, the missing inventory rises to $297,898.35. Thus, even if it is assumed that Stereo cut its customary margin in anticipation of bankruptcy, and that its employees, as instructed, let "no deal walk," there is missing inventory.

That the inventory turned over to the trustee was deficient is also established by the difference between the type of inventory given the trustee—loose, unboxed merchandise—and the new factory-packed goods that a retail, and wholesale, establishment, having sales totaling better than $100,000 a month, would require to sustain this volume.

The similar results reached by the two expert witnesses are probative both of the existence and the amount of the missing inventory. The defendants cannot complain that the extent of the discrepancy has not been established with absolute precision. That an insurance company may not accept a method as a basis for paying claims, and may even explicitly exclude reliance on it, is without significance. An insurance company may define its obligations however it elects. Wrongdoers have no such right. *Cf. Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927).

On the basis of the experts' very similar conclusions, taken together with Schwam's evaluation of the inventory turned over to the trustee and Stereo's schedules, this Court finds that Stereo failed to turn over to the trustee inventory having a value of at least $100,000.

Since Stereo operated at all times under the direction and control of Wren, who has used that direction and control to convey Stereo's assets to corporations controlled by him, it can be inferred that all the missing inventory was transferred to one, or more, of the defendants.

### O. *Miscellaneous Transactions*

Apart and separate from the transfers to Communications which began around December, 1980 with the assignment of Stereo's lease to Communications, a number of transfers by the debtors to Wren took place.

1. *The Mercedes-Benz Vehicles.* Among Stereo's assets in 1979 were two Mercedes-Benz vehicles: a 1973 Mercedes-Benz model 280–S, and a 1976 model 450–SL. Both were acquired under leases which included an option at their termination to acquire ownership.

Wren claimed that he became the owner of the 1973 vehicle in 1978 or 1979; that

sometime in 1979, after he had had a falling out with his wife in July, he sold the 1973 Mercedes for $4,000 to $5,000, and put the money back into the company as a loan. He asserted that around the same time, the 1976 vehicle was transferred to him for its wholesale book value, an appropriate deduction being made in his loan account; that he sold it to a dentist, one Dr. Fred Sands, who permitted him to continue using the car; that Dr. Sands did not pay for the car until October, 1979, when he gave Wren a $10,000 check, which Wren then turned over to Stereo as a loan.[14]

Wren's claim of ownership of the 1973 Mercedes in 1976, or 1977, is inconsistent both with a worksheet maintained by Tunick, Stereo's accountant, and with the testimony of Tunick. Tunick's worksheet reflects a deposit on account of the 1973 Mercedes for the fiscal year ending September 30, 1978. Furthermore, Tunick testified that he did not remove the 1973 vehicle from Stereo's books until August, 1979, although he retroactively dated the change as of October, 1978:

"Q. Mr. Tunick, this schedule of deposits of Checkmate Stereo shows a $554 deposit on a Mercedes. What happened to that deposit?

"A. It was journalized out, August 1979. That was a transfer, I believe, at the time. I remember earlier that the car was transferred to Mr. Wren.

"Q. So that date in August, it was journalized; is that right? Is that the date of transfer?

"A. *That was the date it was journalized.*

"Q. Tell me what happened to it? It was taken from deposits and given some treatment; is that correct? Tell us the treatment.

14. In his divorce proceeding in January, 1980, Wren gave a somewhat different version of his transaction with Dr. Sands:

"Q. Do you recall saying in an affidavit that you were going to give your 450–SL Mercedes to your father as repayment for a loan?
"A. I may have.
"Q. Did you do that?
"A. No, sir, I did not.

"A. It would have been applied against Mr. Wren's loan account." (Emphasis supplied.)

This testimony is consistent with the accounting record he kept for Stereo, which shows an entry for the 1973 vehicle as of "10/78" after an "8/79" entry. Explaining further what he had done, Tunick testified:

"THE WITNESS: This first column here, that is the one that has been on the books since 1974. That was apparently my entry shows in October 1978, that had *a zero book value and it had no value.*

"THE COURT: So what do you do? You just drop it?

"THE WITNESS: I dropped it from the deposit and applied the deposit to an expense and as far as the books are concerned, there would be no auto on the books *because it had no value.*

"THE COURT: Do you know what happened to it in January, 1978 [*sic*]?

"THE WITNESS: Physically, no.

"THE COURT: The company could have remained in possession of the vehicle. It just has no value on the books of the company.

"THE WITNESS: It is just not there." (Emphasis supplied.)

Respecting the 1976 Mercedes, Tunick testified that it likewise remained on Stereo's books until August, 1979, when it, too, was journalized as without value:

"Q. Now, in 1976, there is an entry 'Mercedes new' $858.06; is that correct?
"A. Correct.

"Q. And that entry is carried all the way through until it is journalized at a certain time; is that correct?
"A. Correct.

"Q. When was it journalized?

"Q. Is it a fact that you sold that car or claimed to have sold that car to one Fred Sands?
"A. That's correct.
"Q. When was that?
"A. I believe in November of 1979.
"Q. For how much did you sell it.
"A. $20,000."

"A. In August of 1979.

"Q. Okay. What happened to that vehicle?

"A. It was all paid for, *it had zero book value,* I believe." (Emphasis supplied.)

According to Tunick, both vehicles were transferred to Wren, reducing Wren's loan account, at their "book value": "[b]ook-wise it was sold for book value." Pressed as to the consideration received by Stereo for the transfer, he responded: "I don't know the exact amount, but it would be book value at the time of the transfer." Tunick kept insisting that the exact amounts could be determined by the records of Stereo, in particular, the general ledger:

"Q. Do you know how much consideration the debtor received for either the sale or transfer or assignment of that first Mercedes automobile?

"A. At this date, no.

"Q. Would the records show it?

"A. If they were available, they would show, if not cash, some type of—if it was assigned to Mr. Wren, it would be an offsetting against the loan account, but, at this date, I don't remember.

"Q. The records would show that there was an offset, either a receivable—something that was received—or a loan that was offset?

"A. Correct.

"Q. Would that be true also of the second automobile—

"A. Yes.

"Q. —the new Mercedes?

"A. Yes.

"Q. Do you know how much was received?

"A. I don't know the exact amount, but it would be the book value at the time of the transfer."

Although Wren later claimed that by "book value" was meant "wholesale book" value, Tunick was clearly using the term in its accountancy sense. Since neither of the cars had any book value at the time of the transfer to Wren, the Court finds that Stereo received no consideration for either transfer.

That the automobiles were treated as being without value is borne out by the fact that Wren's loan account grew from $58,323 on September 30, 1978, to $66,930 on September 30, 1979. Thus, the loan account showed no diminution, despite the transfer of two vehicles from Stereo to Wren with a total value of around $15,000. At the same time, Stereo's journals show no payment by Wren to the corporation, which might have increased his loan account, despite the transfer of the two cars. Moreover, according to Tunick, Wren's loan account reflected whatever figures Wren directed, suggesting that it was entirely fictitious in any event.

2. In November, 1979, Stereo paid $1,255.50 to the Bath and Tennis Club at West Hampton Beach. Wren stated that the club was used by him for the purpose of sales meetings, and the check may have covered such use. Another Stereo check went to pay for four season tickets to the New York Islanders. Wren stated that he bought such tickets for the purpose of entertaining potential customers. No evidence was offered by the trustee to contradict this explanation.

3. *Wren's lawyer.* In February, 1980, the lawyer handling Wren's divorce proceeding was paid with a check for $3,500 drawn on Marketing. Allegedly, Marketing owed Wren money at the time; its September 30, 1979 balance sheet showed a debt to him of $4,000.

4. On April 28, 1980, after the petition herein had been filed, Wren cashed a check drawn on Stereo's account in the amount of $9,285.16. The check, he stated, had originally been drawn to pay Audiovox on the C.O.D. deliveries made Stereo.

P. *Credibility of the Witnesses and Admissibility of Evidence*

Wren was the principal witness for both the trustee and the defendants. He obviously is a man of great ability. Almost alone in the courtroom, he could find his way among the various books of account, checks, deposit slips, and other financial records introduced into evidence. But his

talents were largely employed to obfuscate, rather than to clarify. Where no other strategem would serve, he did not hesitate to misrepresent the true situation, describing himself as only a salesman for Communications when he was its president, and similarly minimizing his position at Stereo & Co., referring to himself as only having check-signing powers when, likewise, he occupies the position of president.

In short, Wren was an evasive and untruthful witness. Since he, alone, knows exactly what took place among the various companies for which he made all decisions, all the relevant facts will never be known to anyone else. However, he must bear the responsibility for that circumstance. The two former employees called as witnesses by Wren, the former manager of the Woodside premises, Stuart Kritz, and the present manager of the Manhasset premises, Lawrence Siegfried, showed little more respect for their oath than did Wren. They tailored their testimony to what they deemed the exigencies of the case, rather than respecting their oath to tell the full truth. Neither was a credible witness.

Wren, Sr., himself, never appeared in court, although he was named by the defendants as a witness they intended to call. Close to the end of the trial, Wren used some excuse to volunteer the information that his father was ill and confined to a wheelchair. In view of the unhappy experience of the Court with Wren's earlier representations, the truth of this description of his father's condition is open to question. As already noted, Wren, Sr.'s deposition went into evidence. His testimony, likewise, shows no respect for the truth (*infra*, pp. 618–619.).

At the conclusion of the trial, the Court reserved decision on the admissibility of one of two files of Alan Apfel, Esq., referred to in his testimony but produced after both sides had rested. The Court admitted one file, but reserved decision on the other. After further reflection, the Court has concluded that it should have admitted neither, and it has not considered the contents of either file (Plaintiff's Exhibits 301 and 302) in reaching its decision in this matter.

## DISCUSSION

### A. *Introduction*

These proceedings have exposed a most sophisticated scheme whereby, step-by-step, Wren transferred the considerable assets of the two corporations through which he had previously acted, Stereo and Marketing, to other legal entities nominally owned by his father, but equally under Wren's control. The first step took place in December, 1979. The last, in the bankruptcy courtroom itself, in May, 1980.

This is not denied; it is virtually insisted upon by Wren's counsel. Arguing to the Court at the close of all the evidence, he said:

> "But what was Checkmate Marketing? What was Checkmate * * * Stereo and Electronics? They were vehicles by which Gerald Wren conducted his business. And there is nothing, I submit, improper at all about a businessman who runs two corporate entities and sees that those corporate entities, one or both of them, are in serious financial trouble, cannot continue to do business without continuing to incur even greater debts, saying, 'I'm going to put a stop to that now. Now I've got to think about Gerry Wren, me. What do I do? Am I to stop doing that which I have done all of my business life? Get out of that business because a trustee will come along and presume that if I run a new business, I did it with intent to defraud creditors?'

> "I submit, he doesn't have to think that way at all. And, in fact, *he has every right to continue to utilize* his own talents and *any properties which he fairly can take from the debtor corporation, those hopelessly insolvent corporations*, which have either no value to the creditors of those corporations, or which he takes for a fair or equivalent value property." (Emphasis supplied.)

This describes precisely what occurred here. In September, 1979, Wren's two corporations, Stereo and Marketing, were both

insolvent. Their largest creditor, to whom was owed over $400,000, was pressing for payment. At that juncture, Gerald Wren decided to take away from these insolvent corporations their leases, their fixtures, their inventory, their furniture, their employees, their telephone numbers, their trade name, trademark, trade style, and goodwill, and to turn all these assets over to the new corporate vehicles he had chosen for his talents. Because these corporations are nominally the property of his father, he thought thereby to insulate these assets from the reach of his creditors. He did not transfer the assets of Stereo and Marketing openly; he acted covertly. After both Stereo and Marketing had become empty shells, they appeared to be functioning and unchanged enterprises. Secrecy was essential to Wren's scheme to wrest the assets of the old corporations from its creditors for his own use.

Whether or not Wren believed that the assets he took to be without value to the creditors of Stereo and Marketing, whether or not he believed that he gave in exchange property of fair, or equivalent, value, makes no difference. He did not have the right to strip these corporations of everything which gives a business its value, as he did, and did intentionally and deliberately.

Wren did have the right to continue to use his talents to earn a living for himself and his family. The trustee cannot complain because he became a commission salesman for Eastern Auto Sound. As the Court held at the end of plaintiff's case, he did not thereby take away from Stereo a corporate opportunity. But Wren had no right to employ in his new undertaking Stereo's base station and walkie-talkies, nor carry his business on in the premises and with the fixtures and office equipment wrongfully transferred from Stereo.

He had as little right to shift the goodwill of the retail operations and the leases, fixtures, equipment, and inventory needed to carry these businesses from the debtors to Communications and Stereo & Co., regardless what consideration the debtors ostensibly received. The law on this question is

clear. What Wren did would have been fraudulent as to creditors, if done in good faith; but, in fact, it is characterized by "badges of fraud," including concealment of facts and retention of possession. 4 *Collier on Bankruptcy* ¶ 548.02[5], pp. 548–32—548–40 (15th ed. 1979).

That what was done here is fraudulent as to creditors has long since been settled.

The various transfers are voidable under 11 U.S.C. § 548(a)(1) and § 276 of New York's Debtor and Creditor Law because made with actual intent to hinder, delay, or defraud creditors. They are also voidable under §§ 273, 274, and 275 of New York's Debtor and Creditor Law because not being made in good faith, they lack fair consideration. Many of the transfers are probably voidable as well under § 548(a)(2) because less than a reasonably equivalent value was received in exchange. But the issue of reasonably equivalent value is not reached because it seems so clear that the transfers must be voided on other grounds.

### B. *Intent to Defraud*

As Judge Edward Neaher has pointed out in an analogous connection:

"The analysis begins with a statement of the obvious. Persons whose intention it is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct. *In re Saphire*, 139 F.2d 34, 35 (2 Cir. 1943); *In re Freudmann*, 362 F.Supp. 429 (S.D.N.Y. 1973), aff'd, 495 F.2d 816 (2 Cir. 1974)." *Matter of Vecchione*, 407 F.Supp. 609, 615 (E.D. N.Y. 1976).

The facts are not to be atomized. Where a transfer is only a step in a general plan, the plan "must be viewed as a whole with all its composite implications." *Buffum v. Peter Barceloux Co.*, 289 U.S. 227, 232, 53 S.Ct. 539, 541, 77 L.Ed. 1140 (1933); *Shapiro v. Wilgus*, 287 U.S. 348, 353, 53 S.Ct. 142, 143, 77 L.Ed. 355 (1932). A "clear pattern of purposeful conduct" will support

"a finding of actual intent to defraud." *In re Freudmann*, 495 F.2d 816, 817 (2d Cir. 1974), *cert. denied sub. nom. Freudmann v. Blankstein*, 419 U.S. 841, 95 S.Ct. 72, 42 L.Ed.2d 69 (1974).

■ A plan to appropriate the assets of an insolvent debtor, while holding the debtor's creditors at bay, is in fraud of creditors. *Buffum v. Peter Barceloux Co., supra.* It is in fraud of creditors, even if done in the greatest good faith. *Shapiro v. Wilgus, supra; Leventhal v. Spillman*, 234 F.Supp. 207 (E.D.N.Y. 1964), *aff'd*, 362 F.2d 264 (2d Cir. 1966); *Perkins v. Becker's Conservatories, Inc.*, 318 Mass. 407, 61 N.E.2d 833 (1945). "A transfer, the intent (or obviously necessary effect) of which is to deprive creditors of the benefits sought to be secured by the Bankruptcy Act 'hinders, delays or defrauds creditors' within the meaning of § 67e." *Dean v. Davis*, 242 U.S. 438, 444, 37 S.Ct. 130, 131, 61 L.Ed. 419 (1917).

Instructive in this connection is *Shapiro v. Wilgus, supra.* In that case, Robinson, a dealer in lumber, finding himself unable to pay his debts as they matured, formed a corporation to which he conveyed all his assets, in return for the assumption by the corporation of his liabilities. Thereafter, together with a creditor, he sued for the appointment of a receiver for the business. One of Robinson's judgment creditors brought suit to levy execution on the property in the hands of the court-appointed receiver, attacking both the conveyance and the subsequent receivership as "fraudulent in law against non-assenting creditors." Mr. Justice Cardozo, writing for a unanimous Court, noted that the Court of Appeals had erred in finding the conveyance "fair and lawful." The lower court had predicated its finding on the fact that "the aim of the debtor was to prevent the disruption of the business at the suit of hostile creditors and to cause the assets to be nursed for the benefit of all concerned." 287 U.S. at 354, 53 S.Ct. at 144. Mr. Justice Cardozo, after noting that this was to be accomplished by divesting the debtor of his title and putting it in such a form and place that levies could be averted, continued as follows:

"In this approval of a purpose which has been condemned in Anglo-American law since the Statute of Elizabeth (13 Eliz. ch. 5), there is a misconception of the privileges and liberties vouchsafed to an embarrassed debtor. A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full. * * * The belief even though well founded, does not clothe him with a privilege to build up obstructions that will hold his creditors at bay. This is true in Pennsylvania under the Uniform Fraudulent Conveyance Act * * *. It is true under the Statute of Elizabeth * * *." (Citations omitted.) 287 U.S. at 354, 53 S.Ct. at 144.

Also pertinent is *Leventhal v. Spillman*, 234 F.Supp. 207 (E.D.N.Y. 1964), *aff'd*, 362 F.2d 264 (2d Cir. 1966). That was a proceeding brought by a trustee in bankruptcy to set aside as fraudulent a conveyance by a bankrupt manufacturer of ornamental railings of *all* his business assets to a newly-formed corporation owned by his wife. The consideration for the assignment was the agreement of the corporation to pay all his business debts at the rate of 10 percent a month until $12,400 had been paid. The bankrupt's wife borrowed $2,500, of which she used $500 to buy the stock of the corporation, lending the remainder to the new company as working capital. She became the president of the new corporation; the bankrupt worked for it as a salesman; both served as directors; each received $75 weekly as salary.

Judge Dooling found the transfer fraudulent in fact under § 276 as made with actual intent to hinder, delay, or defraud the bankrupt's creditors. Judge Dooling noted that the term "fraudulent conveyance" was not limited to "unreal, seeming transfers that leave the transferor in covert but real possession of his property." Respecting the

transfer of the assets of the debtor's business to a corporation now owned by his wife, the court noted:

> "The transfer hindered and delayed, and was meant to hinder and delay, all the creditors of the bankrupt whose debts were not assumed. *The bankrupt's assets were removed from their reach irrecoverably.*" (Emphasis supplied.) 234 F.Supp. at 210.

Not only was the transfer a "calculatedly preferential transfer" in that certain creditors, *i. e.*, the bankrupt's business creditors, were preferred over his nonbusiness creditors, but the surplus, if any, inhering in the assets transferred in excess of the debts assumed

> "was reserved by the nature of the transfer to the new company and the stock of that company was detained from the creditors and placed in the hands of the bankrupt's wife against whom the creditors had no rights. Second, the bankrupt and his wife reserved to themselves the management and operation of the property of the new company and positions of profit in its employment." *Id.* at 212.

Clearly, Wren cannot claim a superior position to the railing manufacturer in *Leventhal v. Spillman* because he despoiled all creditors equally, preferring no group above the other. Otherwise, the cases are the same, except that in the *Leventhal* case, the transfer was done openly and on notice to creditors. Here, too, by the nature of the transfer, all value over and above whatever consideration, if any, was paid for the debtors' assets has become the property of corporations against whom the creditors have no right, and Wren is active in the management and operation of the new companies. That at present, he allegedly receives no salary is a condition which, as president, he can alter at will.

In short, as these cases teach, any transfer of *all* the assets of a debtor, if not made solely for the benefit of creditors, must be considered fraudulent. If Wren had acted with the utmost good faith, if he had disclosed from the outset his intention to transfer the assets of Marketing and Stereo to his father's corporations, the transfers would still have been within the condemnation of the law because their effect would have been to hinder and delay creditors. But Wren did not intend simply to hinder and delay creditors; his intention manifestly was to defraud them, to appropriate for himself the goodwill built up for Stereo and Marketing and their value as functioning enterprises. Over a period of a few months, when Stereo and Marketing were totally under Wren's control, substantial assets disappeared. He worked silently and secretly, concealing what was being done. Present here is precisely the conduct at which the Uniform Fraudulent Conveyance Act and its progeny are aimed.

While the debtors were systematically being stripped of their assets, nothing outwardly changed. The same employees continued to work at the same desks in the same premises; the same corporations paid the rent; the signs on the door stayed the same; the inventories on the shelves was no different.

Even as Wren was disabling the debtors from continuing to operate, he induced Audiovox to believe that he was seeking a way to discharge the debts owed it. At a time when Stereo had already transferred its lease to Communications, and had committed itself to leave the premises within months, he talked to Audiovox of consolidating the Manhasset operations with those at Woodside. Through falsehoods and deceptive practices of this character, he bought the time to loot the two companies under his control.

When Audiovox belatedly turned to the bankruptcy court for relief, Wren did not hesitate, even under oath, to continue his misrepresentations, and thereby blunt and delay the exercise of this Court's remedial powers.

In this Court, as before, Wren continued the pretense that both debtors were functioning companies, although Marketing had, in fact, been wholly out of business for more than a month.

In this case, the fraudulent conveyances to Communications constituted only one facet of a total course of activity, of which Wren was the architect, by which the debtors were stripped in less than a year of their retail and wholesale business, all for the benefit of Wren.

The facts here follow a classic pattern. Repeatedly, debtors operating businesses which have become mired in debt have tried to make use of corporations, owned by themselves, or a wife, daughter, or son, to preserve their business and remove their assets from the reach of creditors. *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941); *Buffum v. Peter Barceloux Co., supra; Bartle v. Markson Bros., Inc.*, 299 F.Supp. 958, aff'd, 423 F.2d 637 (2d Cir. 1970); *Lesser v. Mendelson*, 352 F.Supp. 321 (S.D.N.Y.1971), aff'd sub nom. *Lesser v. Jewel Factors Corp.*, 470 F.2d 108 (2d Cir. 1972); *Rudin v. Steinbugler*, 103 F.2d 323 (2d Cir. 1939); *In re Schoenberg*, 70 F.2d 321 (2d Cir. 1934); *Chorost v. Grand Rapids Factory Showrooms, Inc.*, 172 F.2d 327 (3d Cir. 1949); *McWilliams v. Edmundson*, 162 F.2d 454 (5th Cir. 1947), *cert. denied*, 332 U.S. 835, 68 S.Ct. 216, 92 L.Ed. 408 (1947); *In re Clark Supply Co.*, 172 F.2d 248, 254 (7th Cir. 1949); *Jackson v. Star Sprinkler Corp.*, 575 F.2d 1223 (8th Cir. 1978); *Eisenrod v. Utley*, 211 F.2d 678 (9th Cir. 1954); *Matter of Christian & Porter Aluminum Co.*, 584 F.2d 326 (9th Cir. 1978); *Cregg v. Electri-Craft Corp.*, 175 Misc. 964, 25 N.Y.S.2d 920 (Sup. Ct.1941), *mod. Cregg v. Electri-Craft Corp.*, 263 App.Div. 788, 31 N.Y.S.2d 845. Equally consistently, the courts have condemned such efforts and directed the restoration of the converted assets to the creditors. *Ibid.*

Wren did not intend to pay his creditors when he arranged for the transfer of the leases, fixtures, and furniture of Stereo and Marketing to Communications. Forgiveness of the alleged $45,000 debt owed by Stereo to his father gave him no money to pay Stereo's creditors. Wren intended the necessary consequences of his act, which was to leave the two corporations empty shells, with himself in possession of everything they had owned which had value, including their goodwill.

Wren's explanation of the transfers of the leaseholds to Communications is so hollow that even his own counsel abandoned it on final argument. Wren originally claimed that the transfer of all of Marketing's equipment to Stereo was part of a plan of consolidation of the two companies. This claim was totally belied by Siegfried's testimony. According to Siegfried, Wren told him to pack up Marketing's records and inventory so that they could be turned over to the trustee in bankruptcy while Wren started a new business in the Manhasset premises. Everything that was done thereafter was consistent not with consolidation, but with the replacement of Marketing by a new Checkmate company. No customers were referred to Woodside; no employees were transferred. Everything was simply held in suspension until new inventory could be brought in and business resumed as usual, but under the aegis of a new company.

Equally lame was the explanation that Stereo gave up its Woodside lease to Communications so that it would be free to seek new quarters. If that were the purpose of the transfer to Communications, why was the use of the Checkmate logo included in the deal? Furthermore, if it were Stereo's purpose in December, 1979 to secure new quarters, why would it have sold its furniture and fixtures in March, 1980?

There is no other explanation for what occurred here than that Wren decided when Audiovox began pressing him for repayment of the enormous debt owed it that he would salvage for his own use what these debtors had which was of value, and leave Audiovox and the creditors the stripped corporate carcasses.

If Wren lacked all fraudulent intent, why did he conceal the total evacuation of Marketing from its creditors and from the Court? Not only did he fail to disclose these facts, but, forced into a corner, he patently denied that any transfer had taken place.

How could he more clearly manifest an intention to defraud his creditors than by

permitting his counsel to misrepresent in every respect the nature of the business of Communications and Wren's own connection with it? These misstatements laid the groundwork for denying the debtors' trustee in bankruptcy full access to the premises leased by Stereo and the area where Stereo stored its new inventory.

■ Wren's denial of fraudulent intent is wholly inadequate to overcome the clear and overwhelming evidence pointing to such intent as the only reasonable explanation of what occurred here.

The facts here parallel closely those involved in *Lesser v. Mendelson, supra,* 352 F.Supp. 321 (S.D.N.Y.1971), *aff'd sub nom. Lesser v. Jewel Factors Corp.,* 470 F.2d 108 (2d Cir. 1972). There, two corporations owned by related parties were utilized to take over secretly the assets of two corporate dry cleaners. There, too, there was no visible or physical change in the premises occupied by the bankrupts. There, the bankrupt sought to preserve the assets for himself by transferring the equipment and the tenancy of the bankrupts to new corporate entities. The same reasons as led Judge Brieant to find a fraudulent transfer in that case compel the same conclusion here.

So far as fraudulent intent is concerned, the facts here are wholly unlike those in *Feist v. Druckerman,* 70 F.2d 333 (2d Cir. 1934). First, there was no wholesale transfer of assets there; second, there was no evidence in that case that the debtor was insolvent when the transfers there involved were made; third, it does not appear that the transfers left the debtor there involved without the means to pay his debts. Also inapposite because of the factual differences in *In re Adlman,* 541 F.2d 999 (2d Cir. 1976). Here, the extrinsic evidence, lacking there, is present in abundance.

The Court finds that Wren, in effecting the transfer of the assets of Stereo and Marketing to himself, to his father, to Communications, and to Stereo & Co., acted with the intent of hindering, delaying, and defrauding the creditors of the two debtor corporations. Accordingly, the transfers are in fraud of creditors under § 276 of New York's Debtor and Creditor Law, and under 11 U.S.C. § 548(a)(1).

**C.  *Reasonably Equivalent Value of Fair Consideration***

■ The transfer of the debtors' assets between December, 1979 and May, 1980 to the defendants are voidable at the suit of the trustee, without regard to the intent with which they were made, under 11 U.S.C. § 548(a)(2) and §§ 273, 274 and 275 of New York's Debtor and Creditor Law. 11 U.S.C. § 548(a)(2) makes voidable a transfer made by an insolvent debtor for "less than a reasonably equivalent value"; § 273 does so as to a transfer for less than "fair consideration." "Fair consideration" is also critical to §§ 274 and 275.

It is undisputed that as to some of the property transferred, nothing was ever paid the debtors. Thus, Stereo has received nothing for its missing inventory.

■ With respect to other transfers, no consideration was apparently given because no right to compensation was recognized. Thus, no consideration was given Stereo by Stereo & Co. for the right to use a corporate name similar to that of the debtor, and thereby exploit the goodwill built up by that name. Indeed, the goodwill of both the debtors, a recognized asset under the law (*Mutual Life Ins. Co. v. Menin,* 115 F.2d 975 (2d Cir. 1940), *cert. denied,* 313 U.S. 578, 61 S.Ct. 1096, 85 L.Ed. 1536 (1941)) was appropriated without any compensation to the debtors. Nothing was paid for the debtors' telephone numbers, their style of doing business, the leases on their telephones, and other equipment. These transfers are fraudulent as a matter of law. *Feist v. Druckerman,* 70 F.2d 333 (2d Cir. 1934).

■ With respect to other assets (the leases, the fixtures, the trademark), a great deal of documentation has been produced purporting to show the receipt by the debtors of some consideration. This documentation consists of checks, deposit slips, and invoices, all originating with one or more of

Wren's corporations, and all—or virtually all—prepared in his office. But all these companies regularly carried on an enormous number of transactions with one another, buying from each other, selling to each other, lending money to each other. Without the books of the debtor companies and of Communications, and, in particular, without the general ledger of Stereo, it is impossible to reconstruct the financial transactions among the various Checkmate companies. But unless these transactions are reconstructed in their entirety, it is impossible to know whether a deposit made in February is, as Wren asserts, partial advance payment for equipment transferred in March, or relates to some other transactions, like a sale of inventory. It is hornbook law that "when there is a fair doubt, they who have destroyed the evidence must be content if it is resolved against them." *Bentley v. Young,* 210 F. 202, 207 (D.C.N.Y. 1914), *aff'd,* 223 Fed. 536 (2d Cir. 1915).

But it is not necessary to analyze closely the precise consideration received by the debtors for each asset transferred because under New York law, there can be no fair consideration when "good faith" is lacking.

Section 272 of New York's law defines "fair consideration" as follows:

"a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

"b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained."

The "fair consideration" defined in § 272 is "not merely the good and valuable consideration necessary to sustain a simple contract * * *. 'Fair consideration' requires both a fair equivalent and good faith.'" *Cohen v. Sutherland,* 257 F.2d 737, 742 (2d Cir. 1958) (construing language of former § 67(d)(2) of Bankruptcy Act which was similar to that of § 272).

"Good faith" is required of both the transferor and transferee. "The term 'good faith' does not merely mean the opposite of the phrase 'actual intent to defraud'. That is to say, an absence of fraudulent intent does not mean that the transaction was necessarily entered into in good faith. The lack of good faith imports a failure to deal honestly, fairly and openly." *Southern Industries Inc. v. Jeremias,* 66 A.D.2d 178, 183, 411 N.Y.S.2d 945 (2d Dep't 1978). Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer (*Cohen v. Sutherland, supra,* at 742), or because of a transferee's position as an insider with control over the corporation's finances (*Duberstein v. Werner,* 256 F.Supp. 515 (E.D.N.Y.1966)).

In *Southern Industries v. Jeremias, supra,* a transfer was voided

"for lack of good faith because it was consummated with the intent to obtain an unconscionable advantage for one, who is an officer, director and major stockholder of the corporation over the rights of other general creditors." 66 A.D.2d at 183, 411 N.Y.S.2d 945.

The New York court noted that in voiding the transfer of the assets of an insolvent corporation to a director in payment of an antecedent debt, it was applying well-established principles:

"Whether it be upon the theory that directors of insolvent corporations are trustees for the benefit of all creditors, or upon the theory that it would be inequitable to allow directors to use inside information and their controlling voice in corporate affairs to benefit themselves over the claims of others, the common law forbids preferences to directors of insolvent corporations as being contrary to principles of fair, honest and open dealing (see Anns. 19 ALR 320; 38 ALR 90; 48 ALR 479; 56 ALR 207; 62 ALR 738). Accordingly, the transfer in this case is void because, although made for a fair consideration, it was not made in good faith." *Id.* at 185, 411 N.Y.S.2d 945.

*Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208, 412 N.Y.S.2d 901 (2d Dep't 1979), *aff'd*, 48 N.Y.2d 954, 425 N.Y.S.2d 65, 401 N.E.2d 187 (1979), is in agreement. In that case, the transfer of all the assets of a corporation to its sole stockholder or to a corporation controlled by him was set aside as not made in good faith. The New York court laid down the controlling principles as follows:

> "Here it must be again observed that under the Debtor and Creditor Law all transfers must rest on fair consideration (Debtor and Creditor Law, §§ 273, 274, 275) and fair consideration, even for an antecedent debt, requires the transfer to be made in good faith (Debtor and Creditor Law, § 272). The manipulation of corporate assets by the respondents in the face of the petitioner's rights by preferring the interests of those in control of the corporation reflects bad faith and deprives the respondents of the status of transferees for fair consideration." *Id.* at 215, 412 N.Y.S.2d 901.

■ Where assets are conveyed to an insider by an insolvent corporation, good faith will be lacking unless the "transaction carries the earmarks of an arm's-length bargain." *Holahan v. Henderson*, 277 F.Supp. 890 (W.D.La.1967), *aff'd*, 394 F.2d 177 (5th Cir. 1968), *cert. denied*, 393 U.S. 848, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968); *Burroughs v. Fields*, 546 F.2d 215, 218 (7th Cir. 1976); *Bullard v. Aluminum Co. of America*, 468 F.2d 11, 13 (7th Cir. 1972).

None of Wren's transactions with the debtors satisfy this test. It is clear that he took advantage of his domination of the debtors to transfer valuable assets either for no consideration or for a figure far less than Stereo or Marketing could have realized in an arm's-length transaction. Is it likely that Marketing would have transferred the lease on premises on which it invested $90,000 in return for a check for $5,600? Would not the debtors have sought to receive something for their goodwill? For their value as going enterprises? Wren, in paying an arbitrary amount simply for the fixtures and equipment with which the debtors carried on their business, was not dealing in good faith. For this reason, as well as all the others, the transfers to him to his father, and to the Checkmate corporations are voidable under § 273 of New York's Debtor and Creditor Law.

They are also voidable under § 274 because they left the debtors with no capital, which clearly constitutes "an unreasonably small capital." Equally, they fall under § 275 because while these conveyances were taking place, the debtors continued to incur debts which Wren necessarily knew the debtors would be unable to pay as these debts matured, since the debtors would be left virtually without assets.

## D. The Fraudulent Intent of the Transferees

The transferee of each one of the assets stripped from Stereo and Marketing between December, 1979 and May, 1980 was either Wren, Wren's father, or a corporation of which Wren was, or is, president. In respect of the transfers documented by invoices and other instruments, Wren acted in almost all cases for both the transferor and the transferee. It is he, for example, who signed the lease by which Communications took over Marketing's premises; likewise, with respect to the written consent to the assignment of the Woodside lease given by Al's Tire Shop, Wren is identified on the document as president of both Communications, the assignee, and of Stereo, the assignor.

■ Since, as the Court has already found, Wren made the transfers to the corporations he controlled with the intent to defraud his creditors, those corporations necessarily received it with the same intent.

■ If Wren, Sr., as the nominal owner of Communications, is deemed the transferee of any of the transfers, the result is the same. Wren, Sr.'s deposition shows that he was totally knowledgeable about his son's fraudulent scheme and was committed to doing his utmost to assist him. Wren, Sr.'s deposition demonstrates at one and the same time total ignorance of the details of

the business of the corporations he would have us believe he owned and supervised, coupled with complete awareness of the overall scheme by which his son shifted the assets from one set of Checkmate corporations to a different set. It also manifests total willingness to assist his son in his fraudulent scheme.

Respecting Stereo & Co., Inc., the firm that took over Marketing's Manhasset operation, Wren, Sr. testified that he was responsible for forming it, that it was organized by Alan Apfell, Esq., and that it was organized after he (through Communications) had purchased the lease and fixtures of the Manhasset property. Asked what the purchase price of the Marketing lease was, he replied: "There was no purchase price. That was over the question of Marketing folding up, not being able to pay the rent, and I went in and took it over."

Wren, Sr. was mistaken in every particular. Alan Apfell, Esq. did not organize Stereo & Co., Inc. It was organized in January, 1980, and the lease and fixtures of Marketing were not purchased by Communications until March, 1980, some two months later. Contrary to Wren's testimony, the records of Communications reflect a payment to Marketing in February for its lease.

Wren, Sr. claimed that he, as well as his son and Mary Smith, signed the checks of Communications, and any one of these three acting alone, i. e., his son, Miss Smith, and himself, were authorized to sign the checks of Communications. With respect to the only two Communications bank accounts which appear to have been active during the relevant period, Wren, Sr. had no check signing authority as to either.

Although Wren, Sr. purported to be not only the owner of Communications and Stereo & Co. and active in the operations of both, he was ignorant of the most mundane details regarding them. Shown Communications' disbursement journal, he was unable to pick out the name of a single supplier. He also could not name a single one of its customers. Respecting Stereo & Co., he could not furnish its telephone number.

The attempt to represent Wren, Sr. as an active executive of the corporations that have succeeded to the debtors' assets is part of the total fraudulent scheme. That he is willing to go along with this pretense is inconsistent with any claim on his part of good faith. The Court finds that Wren, Sr. was a knowing participant in the fraudulent scheme devised by his son, and aided and abetted him in its execution.[15]

The Court finds that the transfers from the debtors were received by each of the defendants with actual intent to hinder, delay, and defraud the creditors of the debtors.

15. During the course of the trial, the Court observed, when defendants' counsel objected to a question put to Wren with respect to whether Wren, Sr. was somewhere in the north woods in February, 1980, that the question was not unfair in view of what was known respecting Wren, Sr.'s past unavailability in the metropolitan area. Counsel vigorously attacked the Court as wrong, saying that Wren, Sr. "has always been available when Mr. Herzog made an appropriate demand for it, always."

No findings in this Opinion are predicated on any evidence other than the record at the trial, at which Wren, Sr. failed to appear. However, in view of counsel's statements, it is appropriate to note that at the pretrial hearing on July 9, 1980, counsel for the plaintiff stated that he had been hampered in discovery by his inability to examine the records of Communications which were claimed to be with Wren, Sr., who was "salvaging a ship for the government somewhere off Newfoundland." Asked where Wren, Sr. was, counsel for the defendants answered:

"MR. LANGER: I believe he is in Newfoundland. He's either in Maine or New Hampshire or someplace at sea working on a salvage job on a United States Government ship. It's a government contract. He supervises, he has a sharp deadline to complete it, and, apparently, he is out of communication with us now.

"THE COURT: When is the deadline?

"MR. LANGER: I believe it's a couple of months, but I'm not suggesting, your Honor, that we are going to have to wait that long. I don't want to wait that long, so I'm going to do everything that I can to produce Mr. Wren, Sr. long before the time when he will have completed his salvage job. If he has to fly in for a day to appear for a deposition, then we will insist that he do so if it is at all humanly possible. I will be able to advise Mr. Herzog of that shortly, I hope."

## E. *The Appropriate Relief*

■ The trustee has requested the nullification of all the transfers challenged by him, and a judgment for the conversion of the assets involved. Under both the explicit terms of 11 U.S.C. § 550, and under New York decisional law, a money judgment may be awarded against the transferee of a fraudulent conveyance, not received in good faith, who has disposed of the property. Under New York law, judgment may be entered for the proceeds. *American Sugar Refinery Co. v. Fancher*, 145 N.Y. 552, 40 N.E. 206 (1895); *see also Hamilton National Bank v. Halstead*, 134 N.Y. 520, 31 N.E. 900 (1892).

Under § 550 of the Code, the trustee is authorized to recover "for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property," from the initial transferee and any immediate or mediate transferee, and also from "the entity for whose benefit such transfer was made."

■ Thus, the Code no longer restricts recovery, as the Bankruptcy Act did, when *Klein v. Tabatchnick*, 418 F.Supp. 1368 (S.D.N.Y.1976), aff'd, 610 F.2d 1043 (2d Cir. 1979), was decided, to those persons receiving the property fraudulently conveyed.[16] Equally responsible are those entities for whose benefit the transfer was made.

■ In view of the change in the statutory language, decisions like *Elliott v. Glushon*, 390 F.2d 514 (9th Cir. 1967), based on the more limited language of the Bankruptcy Act, have lost their former authority. It is no longer true that Congress has limited the trustee's action "to recovery against persons who have 'received' the property in question." 390 F.2d at 517. Fraudulent conveyances are now like preferential transfers, as to which actions would always lie against the persons who benefited from them, as well as those who were the recipients of such transfers. *Cf. Duell v. Brewer*, 92 F.2d 59 (2d Cir. 1937).

All the persons named in the trustee's complaints are either initial, immediate, or mediate transferees of the initial transfers, or beneficiaries of such transfers. All the assets which formerly belonged to the debtors, including their leases, fixtures, inventory, goodwill, style of doing business, telephone numbers, and trademarks, ended up in the possession of one, or more, of the defendants.

Without trying to be exhaustive regarding the assets acquired by the defendants, the evidence shows that the leasehold which belonged to Marketing is now the property of Communications and the premises it covers are, or were, occupied by Stereo and Automotive. Marketing's fixtures and telephone numbers are now being used by Stereo & Co. The "hotline" formerly belonging to one of the debtors ended up with Automotive. Stereo's Woodside leasehold, assigned to Communications, now houses as well Wren's wholesale business. Both apparently use the mobile telephone and office furniture and fixtures formerly belonging to Stereo.

Wren, Sr., by virtue of the document dated December 20, 1979, obtained "the right to use the 'Checkmate' name and logo" for himself and the corporations of which he claims to be the owner. He also ostensibly furnished the consideration for the assignment of Stereo's Woodside lease to Communications. For all these reasons, he can be considered "the entity for whose benefit such transfer was made."

However, the underlying truth is that the beneficiary of the entire fraudulent scheme by which, step-by-step, the debtors were denuded of their assets, is Wren, himself, and no other. This fact emerged so clearly from the evidence that Wren's own counsel, as has already been noted, in effect conceded that this had occurred, but denied its impropriety. Describing the debtors accu-

---

**16.** When *Klein v. Tabatchnick* was decided, the relevant provision, § 70(e)(2) of the Bankruptcy Act (11 U.S.C. § 110(e)(2)), provided that where a fraudulent conveyance was established, "[t]he trustee shall claim and recover such property or collect its value from and avoid such transfer or obligation against whoever *may hold or have received it* * * *." (Emphasis supplied.)

rately as "vehicles by which Gerald Wren conducted his business," his counsel contended that faced with the insolvency of these concerns, Wren was entitled to "utilize his own talents and any properties which he fairly can take from the debtor corporation, those hopelessly insolvent corporations, which have either no value to the creditors of those corporations, or which he takes for a fair or equivalent valued property."

Even before the change in the statutory language, the Court of Appeals for this Circuit held that the controlling stockholder of a bankrupt corporation was the proper party defendant in an action to set aside a fraudulent conveyance. The defendant, Markson, in that case, like Wren, came into possession of the debtors' assets through the medium of a new family corporation. *Bartle v. Markson*, 357 F.2d 517 (2d Cir. 1966). Judge Friendly, writing for the Second Circuit, sustained the jurisdiction of the trustee's action, even though brought solely against Markson. Judge Friendly noted that Markson "was alleged to be the ultimate recipient of the proceeds of the company's assets that were transferred to Son-Mark [the new corporation] to pay the purchase price of the stock." *Id.* at 522. He went on to note that Son-Mark was claimed "to have been simply a vessel wherein these sums [the assets of the debtor transferred to Son-Mark] * * * were mingled with the loan from Heller before the payment to the stockholders." *Ibid.* Judge Friendly concluded that "to the extent that Markson has received the benefit of a conveyance allegedly fraudulent against creditors he is the proper defendant in a suit to avoid the transfer and section 70e is applicable even on the most literal reading." *Ibid.*

Subsequently, the Court of Appeals, in a *per curiam* opinion, confirmed upon the findings of fact and conclusions of law of the District Court the judgment ultimately entered against Markson. 423 F.2d 637 (2d Cir. 1970). Among other things, the District Court found:

"that the defendant was personally involved in the fraudulent transfers of the corporate property to Son-Mark; that they were to his benefit; that he not only failed to give the creditors notice of this but actually misled them into thinking that business was continuing as usual; that he personally transferred and permitted transfers of cash collections of the corporation to Son-Mark, knowing that creditors were demanding payment and could not be paid; and that his conduct amounted to a violation of Section 276 of the Debtor-Creditor Law in that it was engaged in with 'actual intent' to defraud and hinder present and future creditors." 299 F.Supp. 958, 966.

In other cases, by the device of piercing the corporate veil, recovery of a fraudulent conveyance has been allowed as against individuals, although a corporation ostensibly received the fraudulently conveyed assets. "The doctrine of corporate entity will not be regarded when to do so would work fraud or unjustice * * *." *In re Clark Supply Co.*, 172 F.2d 248, 254 (7th Cir. 1949); *Rudin v. Steinbugler*, 103 F.2d 323 (2d Cir. 1939); *Eisenrod v. Utley*, 211 F.2d 678 (9th Cir. 1954); *Irving Trust Co. v. Kaminsky*, 22 F.Supp. 362 (S.D.N.Y.1937); *Merriam v. Venita Blouse Corp.*, 23 F.Supp. 659 (S.D.N.Y.1938); *Cregg v. Electri-Craft Corp.*, 175 Misc. 964, 25 N.Y.S.2d 920, *mod. in a minor particular*, 263 App.Div. 788, 21 N.Y.S.2d 845 (4th Dep't 1941).

In this case, too, the corporate fiction could properly be disregarded. The so-called corporations were just names on stationery used by Wren as he elected. However, at the closing argument, Wren's counsel objected to the reference by trustee's counsel to the *alter ego* doctrine, declaring that the complaint gave him no notice of the trustee's reliance on that concept. The trustee had made the conventional motion under FRCP Rule 15(b) to conform the pleadings to the proof, and the Court deems the objection not well taken. The entire thrust of the trustee's proof was that the various Checkmate corporations had no reality, but were the vehicles used by Wren in carrying on his business, as counsel for Wren himself recognized in his

closing remarks. But in view of the change in the statutory language, it is not necessary to pierce the corporate veil in order to hold Wren personally liable, since liability is no longer confined to the actual recipients of a fraudulent conveyance.

It is clear that Wren, his father, and the corporations they jointly owned and controlled comprise all the transferees and beneficiaries of the assets which the debtors lost. What is unknown is which one of the defendants received what assets; that information lies wholly within the knowledge of Wren. The trustee's efforts to learn the facts from him have been countered with evasions and, where nothing else served, outright falsehoods. The records which might have supplied the missing information are claimed to have been stolen.

To permit the defendants to retain the fruits of their fraud in these circumstances would be inconsistent with well-established principles. They would thereby be profiting from the obstacles they have deliberately placed in the trustee's way. In *Jackson v. Star Sprinkler Corp. of Fla.*, 575 F.2d 1223 (8th Cir. 1978), the Eighth Circuit stated the controlling rule as follows:

> "It has long been recognized that where parties acting in concert have received property of a bankrupt and have intermixed that property with their own, joint and several liability is appropriate. *Brainard v. Cohn*, 8 F.2d 13, 15 (9th Cir. 1925). We conclude that rule is applicable here. The bankruptcy estates should not bear the burden and expense of establishing which defendants received which property from the transfer. The defendants are thus left to allocate amongst themselves their respective shares of the overall liability * * *." (Footnote omitted.) 575 F.2d at 1235.

So far as possible, all the property fraudulently transferred must be returned. Included are the trademark, the leaseholds, the fixtures, the telephone numbers, the logo, and the corporate identification.

Plaintiff is also entitled to the value of the stock of merchandise which passed into the hands of defendants. *Perkins v. Beck-*

*er's Conservatories, Inc., supra.* The evidence establishes that at least $100,000 in inventory belonging to Stereo was not turned over to the trustee in bankruptcy. That inventory, or its proceeds, was taken by one, or more, of the defendants. "The burden of proof is clearly on the fraudulent grantee to establish the amount of assets transferred, if the assets are entirely under its control and unavailable to the Trustee." *Matter of Christian & Porter Aluminum Co.*, 584 F.2d 326, 339 (9th Cir. 1978) (and cases there cited). The defendants, not having discharged that burden, are all jointly liable for the value of the inventory they received, $100,000.

### F. *The Miscellaneous Transfers to Wren*

█ Wren, alone, is liable for the value of the property directly transferred to him as a result of various conveyances unrelated to the replacement of Stereo and Marketing by Communications and Stereo & Co.

#### 1. *The Transfers of the Two Mercedes Vehicles*

As has already been noted, under New York law, every conveyance made without fair consideration is fraudulent as to creditors without regard to the transferor's actual intent if the transferor is, or will be thereby rendered, insolvent (§ 273).

█ The officer, director, or dominant stockholder of a corporation occupies a fiduciary position in relation to creditors. Accordingly, when a conveyance to such a person on account of an alleged antecedent debt is challenged, "the burden is on him to establish not only the validity of the transfer but also the amount of the antecedent debt which he claimed was thereby secured." *Duberstein v. Werner*, 256 F.Supp. 515, 521 (E.D.N.Y.1966); *Karkus v. Siefert*, 169 F.Supp. 662, 666–68 (D.C.N.J.1958), aff'd, 263 F.2d 333 (3d Cir. 1958).

The sole consideration, if any, received by Stereo in August, 1979 for the two vehicles carried on its books to that time was an alleged reduction in Wren's loan account. But Wren produced no evidence that his loan account was reduced one penny by the

two transfers. On the contrary, Tunick testified that the vehicles were transferred at book value and that their book value was zero.

From this record, the only conclusion that can be drawn is that the conveyances of the vehicles to Wren were entirely voluntary and without consideration.

"Now, there is a rule of long standing in the New York courts that a *voluntary* conveyance made when the grantor is indebted is presumptively fraudulent. We think this means that, if one indebted makes such a transfer, it is presumed, in the absence of some proof to the contrary, that he was then insolvent. *Cole v. Tyler*, 65 N.Y. 73; *Smith v. Reid*, 134 N.Y. 568, 31 N.E. 1082; *Kerker v. Levy*, 206 N.Y. 109, 99 N.E. 181; *GaNun v. Palmer*, 216 N.Y. 603, 111 N.E. 223." (Emphasis in original.) *Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934). Similarly, in *GaNun v. Palmer*, 216 N.Y. 603, 611–12, 111 N.E. 223 (1916), Judge Cardozo wrote:

"[A] transfer without consideration by one who is then a debtor raises a presumption of fraud. The creditor may stand upon that presumption until it is repelled. It is not for him to show what other property was retained."

There is no question but that Stereo was deeply indebted in July and August, 1979. Its debt to Audiovox had been outstanding for almost two years by September, 1979. Under New York law, the transfers to Wren, therefore, were presumptively fraudulent.

Wren's claims that he returned the value of the cars to Stereo as loans have no support in any independent evidence and are entitled to no credence.

Accordingly, the conveyances of the two Mercedes vehicles to Wren were voidable under § 273 of New York's Debtor and Creditor Law because made without fair consideration when Stereo must be presumed to have been insolvent.

Wren must return the two Mercedes vehicles formerly leased by Stereo. If he cannot return the 1973 Mercedes, he must turn over its value, which the record shows to be at least $4,000. If he cannot return the 1976 Mercedes, he must turn over its value, which the record shows to be $10,000.

2. Wren must return to the trustee in bankruptcy the $3,500 paid by Marketing to the lawyer who handled his divorce. At the very least, such payment was a preferential transfer voidable at the election of the trustee under 11 U.S.C. § 547(b). It was a transfer made within ninety days before the date of the filing of the petition on account, at best, of an antecedent debt, and made while the debtor was insolvent, which enabled Wren to receive more than he would receive had the transfer not been made. It was also a fraudulent conveyance because the debtor, having been insolvent at the time the conveyance was made, the burden shifted to Wren to prove what consideration was received by Marketing in exchange for the payment of Wren's personal debt to his lawyer. That Marketing's books showed an antecedent debt to Wren did not discharge that burden. There is no evidence that Wren's loan account was reduced by the payment to his attorney.

3. Wren must also return $9,285.16 received in cash from Stereo subsequent to the filing of the petition. 11 U.S.C. § 549 explicitly permits the trustee to avoid any transfer of property of the estate that occurs after the commencement of the case. This case commenced with the filing of the involuntary petition on April 25, 1980. The subsequent cashing of a check on Stereo's account was *ipso facto* improper and voidable by the trustee. It was also constructively fraudulent.

## G. *Punitive Damages*

The trustee, in addition to requesting the Court to void the fraudulent conveyances which put Communications in possession of all the tangible assets of the two debtors, is also requesting punitive damages against the two Wrens and the corporations they owned and controlled. All are charged with

a "common plan, scheme, and design and conspiracy to hinder, impede, delay, and defraud the creditors of the debtor," and with having "willfully and wrongfully caused injury to property and assets of the debtor," and to have "hindered and delayed the proper bankruptcy administration of the above debtor estate."

But punitive damages are not available under either the Code or New York law. The highest court of New York, the New York Court of Appeals, has squarely held that a fraudulent conveyance is not "the type of behavior for which punitive damages are available or may be justified." *James v. Powell*, 19 N.Y.2d 249, 260, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967), *rev'g*, 26 A.D.2d 525, 270 N.Y.S.2d 789, *and dismissing the appeal from* 26 A.D.2d 621, 272 N.Y.S.2d 686. The type of fraud involved, "removing a judgment debtor's property from the reach of an execution," did not, in the view of the Court, fall within the description in *Walker v. Sheldon, supra*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 179 N.E.2d 497 of "the class of malfeasances for which punitive damages may be awarded." 19 N.Y.2d at 260, 279 N.Y.S.2d 10, 225 N.E.2d 741.

Were the question an open one, it would seem to this Court that in many ways, the circumstances of this case meet the criteria laid down by the New York courts for the award of punitive damages. These are:

"[T]he nature of the conduct, the sufficiency of an award of compensatory damages and other remedies to deter such conduct in the future, and the likelihood that an award of compensatory damages would induce the plaintiff to sue." *Koufakis v. Carvel*, 425 F.2d 892, 907 (2d Cir. 1970).

*See also Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1080–81 (2d Cir. 1977).

The facade presented by the two debtor corporations constituted a continuing deception practiced on the buying and selling public from December, 1979 to May, 1980. They presented the false image of two responsible enterprises from whom one could buy with confidence; that warranties would be honored; and to whom one could sell with the expectation that bills would be paid. With respect to Audiovox, the two debtors' largest creditor, the deception was aggravated by a continuing pretense that the debtors were diligently striving to make good their obligations.

Not only is there present here a high degree of moral culpability, but in circumstances like those present here, the possibility of punitive damages may well be necessary to induce suit to right a wrong that would otherwise go unpunished. Where real estate is involved, the prospect of its recovery may be inducement enough to ensure that the conveyance will not go unchallenged. However, where, as here, the recovery is speculative and the tangible items transferred are depreciating daily, a trustee may well decide that the game is not worth a candle.

But while it appears to this Court that in this proceeding punitive damages would be appropriate, the Court has concluded that it lacks authority to impose them. Furthermore, it questions the right of the trustee to seek them in the name of the defrauded creditors.

The only circumstances under which punitive damages may still be available in New York where a fraudulent conveyance is involved is where such conveyance is an integral part of a larger scheme or conspiracy to defraud. *Chase Manhattan Bank v. Perla*, 65 A.D.2d 207, 411 N.Y.S.2d 66 (4th Dep't 1978). Thus, where an attorney has abused his professional status by repeated fraudulent misrepresentations relied on by the plaintiff, and has thereby assisted in placing the property of the plaintiff's debtor beyond the plaintiff's reach, the New York courts have held that a jury is free to impose punitive damages if it found the necessary degree of moral culpability. *Id.* at 211–12, 411 N.Y.S.2d 66. But the basis of recovery is the damage done the particular creditor by the fraudulent misrepresentations constituting part of a conspiracy to defraud. It is far from clear that the trustee of an insolvent debtor can sue for misrepresentations made to creditors of the

debtor. The trustee is a representative of the creditors, but he does not stand in their shoes for all purposes.[17] If New York recognizes a cause of action for conspiracy to defraud in which punitive damages may be recovered against Wren, that cause of action would appear to be maintainable only by the creditor, or creditors, who can demonstrate damage thereby.

For the foregoing reasons, the Court, although it believes the conduct disclosed by the record in this proceeding to involve the degree of moral culpability warranting the assessment of punitive damages, deems itself without power to assess them.

Accordingly, no punitive damages will be allowed.

### H. *Attorney's Fees*

█ Pursuant to § 276(a) of the New York Debtor and Credit Law, the plaintiff trustee is entitled to the payment of a reasonable attorney's fee. Such fees may be recovered under New York law where a conveyance is found to have been made by the debtor and received by the transferee with actual intent to hinder, delay, or defraud creditors. *Bartle v. Markson*, 299 F.Supp. 958, 966–67 (N.D.N.Y.1969), *aff'd*, 423 F.2d 637 (2d Cir. 1970). An appropriate application should be submitted to this Court to determine the amount of attorney's fees to be awarded.

### CONCLUSION

The Court has jurisdiction of the parties, and has jurisdiction of the subject matter pursuant to 28 U.S.C. § 1471(b) and (c).

### A. *The Transfers by Marketing*

1. Marketing transferred to the defendants within one year before the date of the filing of the petition in bankruptcy its leasehold interest in property located at 11–70 Northern Boulevard, Manhasset, New York, and leasehold improvements, tools, office furniture, display equipment, telephone number, trade name, trademark, trade style and goodwill.

2. At all times between September, 1979 and May 15, 1980, Marketing had a creditor holding an unsecured claim.

3. The transfers were made by Marketing and received by the defendants with actual intent to hinder, delay, and defraud the creditors of Marketing.

4. The transfers were not made in good faith and, therefore, were made without fair consideration, at a time when Marketing was insolvent, when Marketing was engaged in business for which its remaining property was an unreasonably small capital, and when Marketing intended to incur debts beyond its ability to pay as such debts matured.

█ 5. The transfers are void as to the trustee in bankruptcy under §§ 548(a)(1) and 544 of the United States Bankruptcy Code, and §§ 273, 274, 275, and 276 of the New York Debtor and Creditor Law.

6. The trustee is entitled to recover for the benefit of the estate from the defendants the property transferred or its value.

7. In February, 1980, Marketing, for the benefit of Gerald Wren, Jr., transferred to Irving Erdheim, Esq. a check in the amount of $3,500 when Marketing was insolvent and for which Marketing received no consideration.

8. The $3,500 transfer is void as to the trustee in bankruptcy under §§ 548(a)(2)(A)(B)(i) and 544 of the United States Bankruptcy Code, and §§ 273 of the New York Debtor and Creditor Law.

---

**17.** This is the principle suggested in the following excerpt from *Dabney v. Chase Nat. Bank of City*, 201 F.2d 635, 639–40 (2d Cir. 1953) (Hand, L., J.), *cert. dismissed*, 346 U.S. 863, 74 S.Ct. 102, 98 L.Ed. 374 (1953):

"It seems likely that the proper interpretation of the section [70(e)] is that it applies only to occasions where the 'Federal or State law' 'under' which the 'transfer' is 'avoided' directly nullifies it *ex proprio vigore*, and not indirectly by creating rights (e. g. a lien) out of some transaction between one creditor and the bankrupt which the 'transfer' would defeat, if it were valid; in short that the 'creditor's' right must be conferred upon him simply because he is a creditor."
*See also* 4B *Collier on Bankruptcy* ¶ 70.93 at 1075–1076 n.11a (14th ed. 1978).

**626**

9. The trustee is entitled to recover $3,500 from Gerald Wren, Jr. for the benefit of the estate.

## B. *The Transfers by Stereo*

10. Stereo transferred to the defendants within one year before the date of the filing of the petition in bankruptcy its leasehold interest in property located at 72–09 Queens Boulevard, Woodside, New York, and leasehold improvements, office furniture, and tools, and its telephone number, trade name, trademark, trade style, and goodwill, and inventory with a value of $100,000.

11. At all times between September, 1979 and May 15, 1980, Stereo had a creditor holding an unsecured claim.

12. The transfers were made by Stereo and received by the defendants with actual intent to hinder, delay, and defraud the creditors of Marketing.

13. The transfers were not made in good faith and, therefore, were made without fair consideration at a time when Stereo was insolvent, when Stereo was engaged in business for which its remaining property was an unreasonably small capital, and when Stereo intended to incur and believed it would incur debts beyond its ability to pay as such debts matured.

14. The transfers are void as to the trustee in bankruptcy under §§ 548(a)(1) and 544 of the United States Bankruptcy Code, and §§ 273, 274, 275, and 276 of the New York Debtor and Creditor Law.

15. The trustee is entitled to recover for the benefit of the estate from the defendants the property transferred or its value.

16. In August, 1979, Stereo, while insolvent, transferred to Wren, Jr., without consideration, a 1973 Mercedes-Benz model 280–S and a 1976 Mercedes-Benz model 450–SL.

17. The transfers of the two Mercedes vehicles are void as to the trustee in bankruptcy under §§ 548(a)(2)(A)(B)(i) and 544 of the United States Bankruptcy Code, and § 273 of the New York Debtor and Creditor Law.

18. The trustee is entitled to recover for the benefit of the estate the two Mercedes vehicles or their value from Gerald Wren, Jr.

19. On April 28, 1980, after the involuntary petition was filed, Wren cashed a check drawn on Stereo's account in the amount of $9,285.16, for which Wren gave no consideration.

20. The transfer of the $9,285.16 to Wren is void as against the trustee under §§ 548(a)(2)(A)(B)(i), 544, and 549(b) of the United States Bankruptcy Code, and § 273 of the New York Debtor and Creditor Law.

21. The trustee is entitled to recover $9,285.16 from Wren, Jr. for the benefit of the estate.

22. The trustee is entitled to recover reasonable attorney's fees from the defendants pursuant to § 276 of the New York Debtor and Creditor Law.

Pursuant to Bankruptcy Rule 754, the Court is awarding costs to the trustee in the consolidated proceedings.

The foregoing constitutes the Court's findings of fact and conclusions of law. Except as otherwise indicated herein, all motions are denied.